MOUNTAIN STATES TELEPHONE & TELEGRAPH CO.
v. PUBLIC SERVICE COMMISSION et al.

No. 6557. Decided October 25, 1943. (142 P. 2d, 873.)

*W. Q. Van Cott,* of Salt Lake City, and *Brock, Akolt & Campbell,* of Denver, Colorado., for plaintiff.

*Grover A. Giles,* Atty. Gen., *Clinton D. Vernon,* of Logan, and *Warwick C. Lamoreaux,* of Salt Lake City, for defendants.

WOLFE, Chief Justice.

Certiorari to the Public Service Commission to review an order requiring the petitioner, Mountain States Telephone and Telegraph Company, to reduce its intrastate toll message rates.

The facts are, for the most part, not in dispute. The Mountain States Telephone and Telegraph Company (hereafter called Mountain States) is a telephone utility company operating in Colorado, Utah, Arizona, Idaho, Montana, New Mexico, Wyoming, and El Paso County, Texas. It is one of twenty-three associated companies in the Bell System which system is controlled by the American Telephone and Telegraph Company (hereafter called A. T. & T.). Mountain States is under the "sole" and "direct" control of A. T. & T., which owns 73.23 per cent of Mountain States voting

stock. The remaining stock of Mountain States is divided into 480,497 shares owned by 4,354 stockholders.

The Long Lines Department of A. T. & T. (hereafter called Long Lines) operates toll lines in the territory served by the Associated Bell Companies and has two such lines crossing the State of Utah—one running from east to west and the other from north to south. These A. T. & T. lines make physical connections with Mountain States facilities in Utah at only two points, both lines connecting at Salt Lake City and one connecting at Cedar City. A. T. & T. has no operating personnel in Utah. Its Utah properties are operated by Mountain States employees. Mountain States is by contract licensed to use within its territories all telephone patents owned or controlled by A. T. & T. and it also secures "advice" and "assistance" from said company. Most of the equipment and supplies used by Mountain States in its operations are furnished by Western Electric Company, which company is also owned and controlled by A. T. & T. In addition, Western Electric installs much of the central office equipment owned by Mountain States.

In 1941 Mountain States owned over 95 per cent of total telephones in service in Utah. It furnishes general wire communication including both telephone and non-telephone uses. Non-telephone uses include telegraph, tele-typewriter, program transmission for radio, and others. Telephone uses are primarily designated as exchange and toll. Exchange is use within an exchange, such as within Salt Lake City; toll use is between exchanges, such as between Salt Lake City and Ogden. Both interstate and intrastate toll service is rendered by Mountain States. In rendering interstate toll service within the area in which it operates, Mountain States often uses only its own facilities. But it is often necessary in rendering interstate toll service for it to use, in addition to its own facilities, the facilities of the Long Lines Department of A. T. & T. and other Associated Bell Companies.

The Commission found that separate tariffs are published in Utah covering (1) rates for Utah intrastate toll service and (2) rates for interstate toll service handled jointly with A. T. & T. Its interstate rates for jointly handled toll calls are based upon the tariff of the Long Lines Department of the American Company, known as FCC Tariff No. 132. By virtue of a "concurrence" filed by the Company with the Federal Communications Commission in November, 1941, it formally adopted that tariff as its own tariff for jointly handled interstate message toll telephone service. This latter finding is in accord with the uncontradicted evidence.

The present proceeding was instigated in October, 1941, by the Commission to investigate alleged discriminations between Mountain States intrastate toll rates and the toll rates charged by Mountain States for interstate service handled jointly with the A. T. & T. Long Lines Department. The differences between these two schedules of rates will be brought out more fully in the later discussion. It can, however, be noted at this time that both tariffs are based upon airline distances between exchange centers. Long Lines toll rates are generally lower than the Mountain States intrastate toll rates for Utah for comparable distances, but for distances of 16 miles and below the tariffs are the same, aside from certain so-called "exception rates" hereafter mentioned. The inquiry was directed only toward the differences between Mountain States intrastate rates and the rates applicable to interstate toll rates charged on calls handled jointly with A. T. & T. and other Associated Bell Companies. No attempt was made to compare Mountain States' intrastate rates with Mountain States' intracompany interstate rates. The order of the Commission is not at all based upon the differences which exist between Mountain States' intracompany intrastate rates and its intracompany interstate rates for comparable distances.

The reasons why this comparison was not made do not appear.

Mountain States contends, and at the hearing attempted to show, that the differences between Mountain States intrastate toll rates and its rates for interstate toll messages handled joinly with A. T. & T. were reasonable and did not constitute unjust or unreasonable discrimination. The Commission, however, found that the practice of

"charging higher rates for intrastate toll service for distances in excess of 16 miles than it charges for interstate toll service for comparable distances is the maintenance of unreasonable differences as to rates and charges and constitutes the granting of preference or advantage to users of interstate toll service and the subjecting of users of intrastate toll service to prejudicial and disadvantageous treatment in violation of the statute."

On the basis of this finding the Commission ordered Mountain States to reduce its intrastate toll rates for all distances above 16 miles to the level of the A. T. & T. Long Lines rates for comparable distances. It also ordered Mountain States to discontinue the practice of making a report charge on incompleted intrastate person to person toll calls because of the fact that such report charges were not made on such incompleted interstate calls.

Mountain States seeks by a writ of certiorari to have this order vacated on the grounds: (1) That the order is not supported by evidence showing that these differences constitute unlawful discrimination; (2) that if unreasonable discrimination had been shown to exist the commission acted arbitrarily in ordering a reduction to the level of A. T. & T. Long Lines rates without inquiring as to whether such latter rates would be reasonable for Utah intrastate toll service; (3) that the commission unlawfully refused to allow Mountain States to show that any reduction in intrastate toll rates would confiscate the toll plant used in rendering such service; (4) that the commission acted ar-

bitrarily in precluding Mountain States from making a comparison between its intrastate toll rates and the intrastate toll rates of other independent telephone companies operating in Utah; (5) that the commission acted arbitrarily in eliminating differences between the two rate schedules for distances above 16 miles without eliminating the differences in such schedules for distances of 16 miles and under; (6) that the commission was arbitrary in ordering the elimination of report charges; and (7) that the commission did not give Mountain States a fair and impartial hearing.

In attempting to show a reasonable basis for these differences in toll rates, Mountain States produced evidence purporting to show that there were differences in conditions under which it and Long Lines operated which would justify higher rates for its intrastate toll service; that Mountain States had higher operating costs. The evidence thus produced was not contradicted and disclosed the following:

Both concerns base their rates on airline distances. Long Lines rates reflect the average cost of operations over the United States as a whole. Mountain States intrastate rates reflect Utah costs. Two of the more important factors in determining the cost of providing toll service are: (1) Terminal costs and (2) line haul costs. The originating cost and cost of terminal operations for rendering either interstate or intrastate service in Utah would be practically the same because of the fact that Mountain States provides the toll board facilities and the operating personnel for both. Long Lines has no operating personnel or toll boards in Utah. All equipment from the subscriber's station (his home, office, etc.) to the toll board is owned and operated by Mountain States. Thus the same operating personnel and facilities are used in terminal operations both in intrastate and in jointly handled interstate toll calls.

Two principal factors responsible for differences in line haul costs are: (1) Costs per mile of toll circuits, i. e., relative investment, and (2) volume of business available to move over the circuit, i. e., density of traffic. According to Mountain States witness Lindsay, the total outside plant investment per circuit mile in the Mountain States territory is approximately twice that of the Bell System, including A. T. & T. Long Lines. This increased cost per circuit mile in Mountain States territory is occasioned by the circuitous routing made necessary by rough terrain. It is obvious that it costs more per airline mile to build over or around mountains than to build over level areas.

The least equipment which can be used to provide toll service between two centers is a single circuit, usually strung on poles. If only one call per day is transmitted on that circuit, the line haul cost of the call is naturally high. If one additional call is transmitted the line haul cost per call is cut almost in half. As the number of calls increase the line haul cost of each call decreases. When there is enough traffic to necessitate more than one circuit, an additional circuit can be strung on the same lines of poles, cross arms, etc., thus further reducing line haul costs per call. If a third circuit is needed it can be made by the addition of terminal facilities which create a "phantom" circuit between the two existing circuits. There are other devices used, in event a greater number of circuits are required, so that a total of 12 calls each way can be transmitted on a single pair of conductors. However, in order to justify the installation of these devices there must obviously be a large volume of business. Lindsay also testified that there must be long distances involved or the large initial investment required for the installation of such devices would not be justified. Possibly if the distances involved were short, it would be cheaper to construct additional lines than to install this expensive terminal equipment.

Because the distances are comparatively short and the volume of business is not large enough in Utah, it is not practicable to use these devices to any great extent. However, these devices can be extensively used on the jointly handled interstate calls.[1] Further, terminal costs which constitute an important part of total costs do not increase proportionately with the length of the haul so that on long hauls the percentage of the total costs of that call which would be allocated to terminal costs is not so great as it would be on shorter calls.[2] Even if this comparison is limited to those calls in the mileage group from 0-350 miles (the mileage group in which all intrastate traffic moves),

[1] The longest intrastate call in Utah is about 350 miles. Long Line interstate traffic originating in Utah involves distances up to approximately 2,500 miles. The average haul throughout the country is 250 miles, and for Utah originating Long Line calls the average distance is 630 miles. The average haul, in Utah, for intrastate business is 21 airline miles. As of March, 1942, in approximately 83 per cent of Long Lines interstate calls originating in Utah, the companies could take advantage of carrier and phantom facilities as compared with 23.4 per cent of phantom and carrier systems used in connection with providing intrastate toll service in Utah. Only 17% of Long Lines circuits were physical circuits.

[2] Mountain States attaches importance to this because average length of haul in Utah is testified to as being only 21 miles compared with average length of haul for Long Lines of 630 miles on Utah originating calls. On Long Lines the average length of conversation is 4.88 minutes; average length of conversation in Utah intrastate is 2.85 minutes. The average revenue per message is 22.6 cents for Utah intrastate and for Long Lines calls originating in Utah, the average charge per message is $2.97. The average over the nation is $1.73. The cost of getting the parties connected at the terminal stations is substantially the same for all toll calls. If we were to assume that this terminal cost was 5 cents, then using these figures it would be nearly 25 per cent of total revenue received on an average Utah intrastate call but only about 1½ per cent of the total revenue for an average message originating in Utah but transmitted interstate in conjunction with Long Lines facilities.

the evidence shows that on the average the interstate call would be hauled a greater distance.[3]

These factors, as illustrated by figures set out in the footnotes, if taken as a reflection of the true situation, would indicate that Mountain States has higher operating costs per circuit message mile for Utah intrastate toll service than similar costs for jointly handled ∎ interstate service. There is, however, some doubt that these statistics reflect the true picture for the reason that Mountain States insisted throughout the hearing in including in its computations certain toll calls which moved under so-called "exception rates" when they should not have been included.[4] It is not possible for us from the evi-

---

[3]In this regard the evidence shows that in 1941 90.2% of all intrastate calls traveled less than 50 miles; 6.8% traveled in mileage group from 51 to 100; 1.9% traveled in mileage group from 101-150; .6% in group from 101 to 200; .3% in group from 201 to 250; .2% in group from 251 to 300. On the other hand, in 1941 there were 19,800 Utah originating jointly handled calls which traveled in the mileage group from 0 to 350 miles. Of these, no calls moved in the mileage group for 0 to 50; 3.6% traveled in mileage group from 51 to 100; 7.0% traveled in group from 101-150; 26.3% in group from 151 to 200; 17.1% in group from 201 to 250; 17.6% in group from 251 to 300; and 28.4% in group from 301 to 350.

[4]These rates were established many years ago by the request of Mountain States. They are exceptions from the general basic intrastate rate structure under which Mountain States operates in Utah. They apply between certain localities, such as Salt Lake and Murray and other small towns surrounding Salt Lake City, and were established to meet special conditions. They have an initial period rate of 5 cents per call. According to the testimony of the Mountain States' witness, Hyde, 41 per cent of all intrastate toll calls move under these exception rates. Since these rates were established at the request of the Mountain States to meet special circumstances, and since they are exceptions from the basic intrastate toll rates under examination here, they should not have been included in computations which were designed to give a comparison between Long Lines basic interstate toll rates and Mountain States basic intrastate toll rates. Most of these toll calls moving under these exception rates are for short distances and the revenue per call is lower than would be received if the basic intrastate toll rate applied. Hence, the figures showing

dence in the record, to revise these figures by cutting from them the exception rates so as to get a true picture. We do know that they would be revised upwards, but that at least, as to the testimony regarding the fact that in only 23 per cent of toll calls in Utah can Mountain States take advantage of phantom and carrier circuits, the exclusion of these exception rates would still not bring the figure (23%) as high as the comparable figure (83%) for A. T. & T.[5] Likewise, since the longest intrastate call that could be made in Utah is less than 400 miles, the average could not possibly be as great as the 630 mile average for Utah originating jointly handled interstate calls.

In considering this evidence the Commission found that Mountain States had not shown any substantial differences in operating conditions between its intrastate toll business and its interstate toll service rendered jointly with A. T. & T. It also found that the

"Company's comparisons on nation-wide operating conditions, density of traffic costs per circuit mile of plant with such factors in Utah, if to any extent pertinent to the matter under investigation are entitled to but little, if any, weight. If the comparisons had been made after relating the various factors to Utah intrastate toll and that interstate toll service which originates in Utah (or terminating in Utah in case of collect calls) and handled jointly by the Company [Mountain States] and the American Company, [A. T. &. T.] the comparisons might have been more helpful to the Commission."

that the average length of toll calls in Utah is only 21 miles; that only 23.4 per cent of toll calls can be transmitted with the use of phantom and carrier circuits; and average length of conversation and the average revenue received per call, if they include these exception rates, tend to give a distorted picture.

[5]For example, if we were to assume that the total number of intrastate calls was 100, then under the testimony 23 of these calls can be transmitted in part over phantom or carrier circuits. Forty-one of these hundred calls are "exception rate" calls which should not be considered. If none of these 41 "exception rate" calls involved use of phantom circuits, then of the remaining 59 calls, 23 would involve the use of phantom circuits—or slightly under 40 per cent. Yet 83 per cent of Long Lines Utah originating calls can take advantage of phantom and carrier circuits.

It appears from the evidence detailed above that Mountain States did make the very comparison which the Commission suggests that it should have made. But many of these factors brought out by the comparison made are taken into account by the rate structures themselves.[6] A more apt comparison would have been a comparison of costs per mile of a 50 mile intrastate call with the costs of a 50 mile interstate call; a 100 mile intrastate with a 100 mile interstate, etc. Merely showing that on an average interstate calls travel farther, bring greater average revenue per call, etc., does not show that an interstate call can be transmitted 100 miles at a lower cost than a 100 mile intrastate call.

Further, the Commission seeks only to compare Utah intrastate toll calls with jointly handled interstate calls for *comparable distances*. All intrastate calls travel in the mileage group between 0 and 350 airline miles. The only jointly handled interstate calls originating in Utah which the Commission seeks to compare with these intrastate calls are those which travel in this same mileage group. But in making such a comparison it should be kept in mind that the Long Lines rates which apply to the jointly handled interstate calls are not based on costs of operation in the area within a 350 mile radius of Utah, but are based on average costs over the nation for calls of comparable distances.

If on an average these jointly handled interstate calls can be transmitted for a lower average cost per airline mes-

---

[6]For example rates per airline mile decrease as the distance called increases. This is occasioned by the fact that cost per mile decreases as distance called increases. This is true in both intrastate and interstate toll calls and is given effect by both rate schedules. Under intrastate rate schedule the subscriber would pay $.35 for a 40 mile call, or .875 cents per airline mile; for 100 miles he would pay $.70 or .7 cents per mile; for 300 miles he would pay $1.60 or .5⅓ cents per mile. Likewise under the interstate schedule the subscriber would pay $.35 for a 40 mile call or .875 cents per mile; $.55 for 100 miles or .55 cents per mile; $1.00 for 300 miles or .3⅓ cents per mile; $4 for 3,000 miles or .1⅓ cents per mile.

sage mile, it would seem that this would show a very material difference which would justify a higher rate for intrastate toll calls. It would, therefore, appear that Mountain States had succeeded in showing a reasonable basis for *some* differences in the two rates schedules.

The evidence conclusively shows that Mountain States is owned and directly controlled by A. T. & T. From the standpoint of establishing rates we must consider them as though they were but one company. As such, they have established rates under which the intrastate subscriber pays more for a short haul than an interstate subscriber pays for a longer haul over the same route and same facilities. This prima facie constitutes unreasonable discrimination, for a local rate is prima facie unreasonable if it is in excess of through rates traveling the same route. See *Morgan* v. *Missouri, etc., R. Co.*, 12 I. C. R. 525; *Montreal Bd. of Trade* v. *Canada Pac.*, 18 Can. R. Cas. 6. To better understand the position of the Commission in this regard we refer to the folowing diagram:

The diagram represents the State of Utah. From point A to Salt Lake City is 150 miles. Under the intrastate tarriff schedule a call originating at point A and terminating in Salt Lake City would cost the subscriber $1 or .6⅔ cents per airline mile. If the call, instead of stopping at Salt Lake

were to continue, using Mountain States facilities, to point B, 300 airline miles from A, the subscriber would pay $1.60 or .5⅓ cents per airline mile. If the call, using exactly the same facilities between point A and Salt Lake City were at the absorption point in Salt Lake City plugged into Long Lines facilities and transmitted from Salt Lake City by Long Lines to point C, which is 300 airline miles from A, the cost to the subscriber would be only $1 or .3⅓ cents per airline mile. The call from A terminating in Salt Lake City and the call from A through Salt Lake City to B would both move entirely over Mountain States facilities and be governed by the Mountain States intrastate rates; the call from A through Salt Lake City terminating at point C would move from A to Salt Lake City on Mountain States Lines and thence on Long Lines to C and would be governed by Long Lines interstate rates.

It is important to note that each of these calls, i. e., the intrastate call from point A terminating either at Salt Lake City or going on to point B, as well as the call from A through Salt Lake City to C, move over exactly the same facilities from A to Salt Lake City. Each would use Mountain States facilities exclusively; would be handled by Mountain States personnel; would travel the same airline distance and the same railroad or pole line distance. In other words, as far as operation costs to transmit that call from A to Salt Lake City are concerned, those costs would be substantially the same whether the call were to terminate in Salt Lake City or go on to either point B or point C. And in addition to the cost to Salt Lake City, if the call were going on to either B or C, it must travel an additional distance of some 150 airline miles. The subscriber would be charged $1.60 for the 300 miles from A to B. But for the 300 miles from A to C he would pay only $1.00, the same price he would have been charged had he only called the 150 miles to Salt Lake City. Under the Commission's order, Mountain States would be compelled to reduce its rates from A to B from $1.60 to $1—the present charge for

the equal distance from A to C; the call from A to Salt Lake City would be reduced from $1 to $.65.

As already pointed out, costs per mile decrease as the distance called increases because costs do not increase proportionately with distance. Thus a person calling 300 miles from A to either point B or point C should get a somewhat lower rate per mile than if he had called only 150 miles to Salt Lake City. Both schedules are designed to give him this reduced rate per mile. However, this factor (decrease of cost per mile with increase of distance called) does not entitle him to a rate which is so much lower per airline mile that he will be permitted to call 300 miles as cheaply or more cheaply than he can call 150 miles when the 300 mile call uses all the facilities used in completing the 150 mile call and in addition uses the facilities necessary to transmit it an additional 150 miles.

The example chosen is not an isolated instance but merely illustrates the degree of difference between the two rate schedules. In every case where a Utah originating call is handled jointly by Mountain States and Long Lines, the call is transmitted from its point or origin to one of the absorption points, in either Salt Lake City or Cedar City, entirely on Mountain States facilities. At this absorption point it is plugged into Long Lines facilities and carried the rest of the distance on Long Lines trunk lines. In practically every case involving such a call the subscriber is given the use of Mountain States facilities between the point of origin and the absorption point at a rate considerably below that rate which would have been charged to an intrastate subscriber using the same facilities.

The example the Commission relied on primarily to illustrate this situation is this: The rate from Richfield to Salt Lake City is $.95. The rate from Richfield through Salt Lake City to Elko, Nevada, is $.85. The former call travels between 135 and 140 airline miles; the latter would travel between 220 and 244 airline miles. Likewise, for a 300 mile call from a point in Southern Utah to Salt Lake

City the charge would be $1.60; a 600 mile call from the same point through Salt Lake City to a point outside the State would cost the subscriber only $1.50. It is not necessary to further multiply these examples. They aptly illustrate the degree of the differences in the two rate schedules.

In view of the facts as set out in detail above, we believe the Commission could reasonably conclude that these differences prima facie constitute unreasonable discrimination. Other recent cases involving similar fact situations have so held. See *In re Michigan Bell Telephone Co.*, 25 P. U. R., N. S., 24, affirmed *Michigan Bell Telephone Co.* v. *Michigan Public Service Comm.*, 297 Mich. 92, 297 N. W. 198; *Bell Tel. Co. of Pa.* v. *Pennsylvania Public Utilities Commission*, 135 Pa. Super. 218, 5 A. 2d 410, appeal dismissed, *Bell Tel. Co. of Pa.* v. *Pennsylvania Public Utilities Comm.*, 309 U. S. 30, 60 S. Ct. 411, 84 L. Ed. 563.

The next contention of Mountain States is that even though unlawful discriminations exist, it is necessary for the Commission, in order to eliminate them, to take evidence and make findings as to what would be just, reasonable or sufficient rates. In support of this contention Mountain States relies on Section 76-4-4, U. C. A. 1943, which, insofar as material here, provides:

"Whenever the commission shall find after a hearing that * * * rates * * * are unjust, unreasonable, discriminatory or preferential, * * * the commission shall determine the just, reasonable or sufficient rates * * * and shall fix the same by order as hereinafter provided * * *."

It is clear from the record that the Commission did not consider this to be a general rate case, and did not consider all those factors which are usually involved in ascertaining the reasonableness of rates. The Commission contends, however, that such an inquiry was not necessary for Long Lines interstate rates were set up with the approval of the Federal Communications Commission and Mountain States voluntarily concurred in said rates. By this concurrence Mountain States agreed as follows:

"Mountain States * * * assents to, adopts, and concurs in the tariffs described below [Long Lines tariffs) together with amendments thereof and successive issues thereof which the named carrier may make and file, and hereby makes itself a party thereto and hereby obligates itself and its connecting carriers to observe each and every provision therein until this authority is revoked * * *."

In view of these facts the Commission contends that it was justified in assuming that Long Lines rates were a just and reasonable measuring rod for Utah intrastate traffic. The Commission's argument in this regard is briefly this: For the use of facilities between the point of origin and point where the call is connected with Long Lines facilities, Mountain States has admitted, by this concurrence, that Long Lines rates are reasonable. Therefore, it argues, Mountain States cannot be heard to say that these same rates would not be reasonable for the use of these same facilities if the call were to terminate at the absorption point or at another point within the state rather than go on to some point outside the State of Utah. In this regard the Commission relies primarily upon *Michigan Bell Tel. Co.* v. *Michigan Pub. Service Comm.*, 297 Mich. 92, 297 N. W. 198; *Bell Tel. Co. of Pa.* v. *Pennsylvania Public Utilities Comm.*, 135 Pa. Super. 218, 5 A. 2d 410; and *In re Long Island R. R. Co.*, (N. Y.) 15 P. U. R., N. S., 515. In each of these cases there was a finding that there were no substantial differences in operating conditions between interstate and intrastate traffic which would justify any difference in rates. In the Michigan Bell Tel. Co. case [297 Mich. 92, 297 N. W. 204], the court stated:

"In our opinion plaintiff has failed to show any substantial difference between the interstate business of the Michigan Bell Telephone Company (conducted jointly with the Long Lines) and its intrastate business."

In Bell Tel. Co. of Pa., supra [135 Pa. Super. 218, 5 A. 2d 416], the court stated:

"Appellant argues that a difference in rates for similar services may be justified by a difference in circumstances. This is correct, but the argument does not help appellant. There is a difference here

in circumstances—the interstate calls involve more service and equipment than the intrastate calls, and use the same service and equipment involved in intrastate calls, in the same direction."

And in the In re Long Island R. R. Co. case, supra, the Commission stated:

"Where, as in this proceeding, it appears that the rate per mile charged for intrastate passengers is approximately 50 per cent higher than the fares charged interstate passengers, this fact alone establishes prejudice and preference, which, unless justified by a *difference in transportation, circumstances, and conditions,* is so undue and unreasonable that it is in violation of this section. The record not only fails to disclose any such justification but definitely warrants the conclusion that none exists." (Italics added.)

If it had appeared from the evidence here that there were no differences in operating conditions between interstate traffic conducted jointly with Long Lines and Utah intrastate traffic which would justify difference in rates, Mountain States could not be heard to say, after its concurrence in Long Lines rates, that Long Lines rates were not reasonable for intrastate traffic. This logic is inexorable. As stated in the annotation to the case of *Northern Pac. R. Co.* v. *State of North Dakota,* 236 U. S. 585, 35 S. Ct. 429, 59 L. Ed. 735, L. R. A. 1917F, 1148, found in Ann. Cas. 1916A, at page 16:

"Rates charged elsewhere under similar circumstances for the same or similar services are evidentiary of the reasonableness of the rates in issue with respect both to the rights of the public and of the carrier, the assumption being logical, that a rate reasonable in one instance will be reasonable in all instances where the same or similar services are performed under similar conditions." Citing *Smyth* v. *Ames,* 169 U. S. 466, 527, 18 S. Ct. 418, 426, 42 L. Ed. 819; and several cases from various other jurisdictions.

"But in any instance the comparison is of little value unless a similarity of service and conditions is shown." *Smyth* v. *Ames,* supra; *Parsons* v. *Chicago, etc., R. Co.,* 8 Cir., 63 F. 903; *Interstate Commerce Commission* v. *Southern R. Co.,* C. C., 117 F. 741, affirmed 4 Cir., 122 F. 800.

Here the evidence shows that such differences do exist. First, the jointly handled interstate service can be rendered

at a lower average cost per message mile.[7]  Second, Long Lines rates are not based on costs of operations in this area, but are based on average costs over the nation, which average costs per message mile are lower than average costs entailed by Mountain States in its Utah intrastate operation.

Another factor which Mountain States contends makes a comparison of these two rate schedules of little value is this:  Exhibit 33 shows that over 90% of all Utah intrastate toll calls travel airline distances of less than 50 miles and that no jointly handled interstate toll calls are hauled for such short distances.  This exhibit purports to show the distribution to various mileage groups of Utah intrastate and Utah originating Long Lines interstate messages for the year 1941.[8]                    .

[7]This is occasioned by the fact that in a higher percentage of cases the jointly handled call can take advantage of phantom and carrier circuits.  Referring to the diagram set out above, the call from A to B and the call from A to C would both use the same facilities from A to Salt Lake City and would cost substantially the same up to that point.  But after reaching the absorption point, Salt Lake City, the call going outside the State, such as to point C, could be transmitted over trunk lines using phantom and carrier circuits, while calls going on to points within the State, such as to point B, cannot take advantage of the use of such circuits to any great extent.

[8]Exhibit 33 follows:

| Mileage Group | Intrastate Number | Per Cent | Cumulative Per Cent | Long Lines Number | Per Cent | Cumulative Per Cent |
|---|---|---|---|---|---|---|
| 0- 50 ..... | 3,429,700 | 90.2 | 90.2 | none | none | none |
| 51-100 ..... | 258,100 | 6.8 | 97.0 | 700 | .6 | .6 |
| 101-150 ..... | 72,300 | 1.9 | 98.9 | 1,400 | 1.2 | 1.8 |
| 151-200 ..... | 22,500 | .6 | 99.5 | 5,200 | 4.6 | 6.4 |
| 201-250 ..... | 13,400 | .3 | 99.8 | 3,400 | 3.0 | 9.4 |
| 251-300 ..... | 6,800 | .2 | 100.0 | 3,500 | 3.1 | 12.5 |
| 301-350 ..... | 200 | .... | .... | 5,600 | 5.0 | 17.5 |
| 351-400 ..... | ...... | .... | .... | 5,800 | 5.1 | 22.6 |
| over 400 ..... | ...... | .... | .... | 87,400 | 77.4 | 100.0 |
| Total ..... | 3,803,000 | 100.0 | .... | 113,000 | 100.0 | .... |

There are various factors relating to the figures set out in this table which might indicate that they do not make the comparison which the commission is seeking to make.[9] Yet even if we strike from these computations all matters which the commission might contend were improperly included, and in addition we limit the comparison to only those distances between 0 and 350 miles, the figures in the table would nevertheless still show that from 0-50 miles no interstate jointly handled calls moved. It is upon this fact that Mountain States bases its contention that the Commission acted arbitrarily in ordering a reduction of intrastate rates to the level of Long Lines rates for distances between 17 and 50 miles. It is further urged that this table shows that the Long Lines rates for from 17-50 miles are mere "paper rates" or "dry rates" under which no traffic moves and that they, therefore, cannot be used

[9]It should be noted that the commission only seeks to compare these rates for 350 miles and under. In this 0-350 mile group there are, according to the table (Exhibit 33), only 19,800 jointly handled interstate calls to which Long Lines rates apply. If only these 19,800 were considered the percentages in the columns and the Long Lines section would be revised upwards as follows:

| Mileage Group | Number | Percent | Cumulative Percent |
|---|---|---|---|
| 0- 50 ................. | none | none | none |
| 51-100 ................. | 700 | 3.6 | 3.6 |
| 101-150 ................. | 1,400 | 7.0 | 10.6 |
| 151-200 ................. | 5,200 | 26.3 | 36.9 |
| 201-250 ................. | 3,400 | 17.1 | 54.0 |
| 251-300 ................. | 3,500 | 17.6 | 71.6 |
| 301-350 ................. | 5,600 | 28.4 | 100.0 |
| Total ................. | 19,800 | 100.0 | 100.0 |

It should also be noted that these figures probably include the "exception rate" calls referred to above. If so they should be taken out of this computation. According to the evidence 41% of all intrastate toll calls move under these exception rates. Nearly all of this 41% would be included in the first group, 0.50 miles. Their exclusion would materially change all the percentages listed under the intrastate column.

as a measuring rod to establish the reasonableness of Utah intrastate rates.[10]

Since we have already held that Mountain States has shown differences in operating conditions which would make a comparison of these two rate schedules of little value to a determination of or establishment of reasonable intrastate rates, it would not be necessary from that standpoint to further consider this additional claimed difference, to wit: The argument relating to paper rates. However, the Commission may upon further inquiry find that the differences which are shown to exist are insubstantial or immaterial differences; or it may desire to use Long Lines rates as a measuring rod to establish a differential between the two rate schedules. We, therefore, deem it necessary to analyze this argument further. The first answer to it is that these rates are not true paper

---

[10]In connection with this testimony that no jointly handled interstate calls do move for distances of less than 50 miles it is also urged that because of physical factors, such calls could not possibly travel for such distances. This conclusion is apparently based upon the fact that all jointly handled calls must go from their point of origin to an absorption point where physical connections are made with Long Lines. The only two absorption points in Utah, Salt Lake City and Cedar City, are both more than 50 airline miles from any state borderline. It is, therefore, concluded that no jointly handled call originating in Utah could move for a distance of less than 50 miles. But this would only hold true so long as no exchange centers were established near the state borders near to exchange centers in towns in neighboring states. According to the uncontradicted evidence rates are based on airline miles between exchange centers. The fact that the call is routed from the exchange center through Salt Lake City and then back out into the same territory and across a state line is not controlling. If an exchange center were located near a state border line in Utah within say 20 miles of another exchange center in Nevada, the Long Lines rates would apply. Such exchanges could be established, although the available traffic probably would not justify it at the present time. Hence all Mountain States could mean by this argument is that no jointly handled calls could move from 17 to 50 miles on Utah originating calls without the installation of new plant equipment and the establishment of new exchange centers.

rates for Long Lines undoubtedly serves areas in the nation where traffic does move under these rates for these distances. Second, these rates were established by Mountain States and A. T. & T. and these two companies must, for this purpose, be considered as though they constituted but one company. The rates apparently represent their best estimate as to what rates would be reasonable for jointly handled interstate toll calls for distance of from 17 to 50 miles if traffic were to move for these distances. Certainly these rates, established, voluntarily by the companies themselves, have some evidentiary value. In effect the companies by publishing these rates have said: "We estimate that if there were Utah originating interstate jointly handled calls for distances of from 17 to 50 miles, we could haul them at these rates and these rates would be reasonable." If the rates did not have at least this effect, why were they published? Must we assume that Mountain States has voluntarily published rates for these distances which would be entirely unreasonable for its jointly handled interstate business? Surely not. We must conclude that if these two rate schedules were otherwise comparable, this factor of "paper rates" would not materially detract from the efficacy of such a comparison. To summarize to this point:

The Commission having correctly held that the evidence prima facie showed unlawful discrimination, the burden was on Mountain States to justify the differentials. Operating conditions in Utah were shown to be unfavorable as compared to those in many other sections of the United States which go into making the average for Long Lines rates, but whether the Utah conditions were so unfavorable as to warrant the full differentials now existing was not shown. Hence the Commission was not arbitrary in assuming the present differences were unreasonable, but it was arbitrary in finding that no differentials were justified and that Long Lines rates should be the measure for Utah rates. The Commission by 76-4-4, U. C. A. 1943, was re-

quired to find a just rate. Finding that Long Lines rates were just rates in view of the demonstrated differences in operating conditions was therefore arbitrary. There are different methods of determining "just, reasonable and sufficient rates."

The Commission may initiate its own inquiry gathering evidence as to rates under similar conditions elsewhere, cost data under similar conditions of traffic and operation, or it may ask the company to present data as to its costs in Utah and analyze such data or it may follow both methods. Any evidence is material which will throw light on the subject. But the burden is on Mountain States to overcome the effect of the showing that its present rates are unjust.

This holding that the Commission must under 76-4-4 make a finding as to what would be just, reasonable or sufficient rates and the holding that this finding cannot be based solely upon a comparison with other rate schedules not shown to be applicable to a situation substantially the same as Utah intrastate conditions, disposes of several of the contentions raised by Mountain States. However, it is necessary for the guidance of the Commission to determine several other issues which have been raised.

Mountain States pleaded, and during the hearing argued, that to reduce Utah intrastate rates to the level of Long Lines interstate rates would confiscate Mountain States intrastate *toll* property in Utah. There was no contention that it would confiscate all of the intrastate property, both toll and exchange. The Commission held that since it was not pleaded that the proposed reduction in rates would prevent Mountain States from making a fair return on its intrastate business as a whole (both exchange and toll) it was not necessary for it to hear any evidence on the issue of confiscation; that where there was no claim of confiscation based on state-wide operation, the Commission might remove unjust and unreasonable discriminations without inquiring as to whether the new rates would confiscate

the plant involved in rendering the particular service involved.

The Commission also argues that since this is a proceeding to remove unreasonable differences in rates rather than one to establish a reasonable rate, the issue of confiscation becomes unimportant. But by such an argument the Commission evades the issue. If *any* reduction in Mountain States' present intrastate toll rates would confiscate its toll properties, and if, as it contends, it has a constitutional right to a fair return on its toll properties considered separately, this fact would be sufficient justification for its present toll rates. If, in fact, it does have such a constitutional right, it cannot be deprived of it merely by designating this as a discrimination case. It would not be compelled to reduce its rates to a confiscatory level merely because A. T. & T. operates at a profit on a lower rate. If A. T. & T. can operate and obtain a fair return at a given rate which, if applied to Mountain States, would confiscate its property, then this fact itself becomes a sufficient justification for *some* difference in rates under which the two operate. We must, therefore, determine whether or not Mountain States has a constitutional right to a fair return on its toll property considered separately.

A general background to this problem has been laid by the cases dealing with railroad regulation in which two lines of cases have developed in the United States Supreme Court. As pointed out by Cardozo, in a dissenting opinion in *Interstate Commerce Comm.* v. *Oregon-Washington R. & Nav. Co.*, 288 U. S. 14, 53 S. Ct. 266, 278, 77 L. Ed. 588:

"Once more we are to keep in mind the changes that have been wrought by the Transportation Act of 1920 [49 U. S. C. A. § 71 et seq.]. In cases unaffected by that act, two lines of decisions, following separate and yet neighboring channels, are to be found in the reports. The first, represented by *Northern Pacific Railway Co.* v. *[State of] North Dakota*, 236 U. S. 585, 595, 35 S. Ct. 429, 59 L. Ed. 735, L. R. A. 1917F, 1148, Ann. Cas. 1916A, 1, and *Brooks-Scanlon Co.* v. *Railroad Commission of Louisiana*, 251 U. S. 396, 40 S. Ct. 183, 64 L. Ed. 323, is made up of cases where the return for a partic-

ular service was considered in isolation without reference to earnings generally. The second, represented by *St. Louis & San Francisco R. Co.* v. *Gill*, 156 U. S. 649, 667, 15 S. Ct. 484, 491, 39 L. Ed. 567, 573; *Puget Sound Traction, Light & Power Co.* v. *Reynolds*, 244 U. S. 574, 37 S. Ct. 705, 61 L. Ed. 1325, and *United Fuel Gas Co.* v. *Railroad Commission, supra* [178 U. S. 300, 49 S. Ct. 150, 73 L. Ed. 390], is marked by the cases where the compulsory enlargement of the range of public service has been held to be permissible if the combined return is adequate for the system as a whole. By force of the act of 1920, the zone has been narrowed for the application of the principle which has illustration in the first group, and correspondingly widened for the application of the principle which has illustration in the second."

As would be expected, Mountain States relies on the first line of cases and the Commission relies on the second.

In *Northern Pacific Railway Co.* v. *State of North Dakota,* supra, the U. S. Supreme Court held unconstitutional a statute which singled out a particular commodity, coal, and imposed upon it a rate which would not yield a fair return to the carrier. The court said (35 S. Ct. at page 434) :

"Frequently, attacks upon state rates have raised the question as to the profitableness of the entire intrastate business under the state's requirements. But the decisions in this class of cases (which we have cited in the margin) furnish no ground for saying that the state may set apart a commodity or a special class of traffic and impose upon it any rate it pleases, provided only that the return for the entire intrastate business is adequate."

And again at page 436 of 35 S. Ct., by way of summary the court stated:

"With respect to particular rates it is recognized that there is a wide field of legislative discretion, permitting variety and classification, and hence the mere details of what appears to be a reasonable scheme of rates, or a tariff or schedule affording substantial compensation, are not subject to judicial review. But this legislative power cannot be regarded as being without limit. The constitutional guaranty protects the carrier from arbitrary action and from the appropriation of its property to public purposes outside the undertaking assumed; and where it is established that a commodity, or a class of traffic, has been segregated and a rate imposed which

would compel the carrier to transport it for less than the proper cost of transportation, or virtually at cost, and thus the carrier would be denied a reasonable reward for its service after taking into account the entire traffic to which the rate applies, it must be concluded that the state has exceeded its authority."

The rule laid down by this case has been cited with approval in many later Supreme Court and Federal Court decisions.[11] However, the rule of this case cannot be literally applied even to rail roads. Under the rule the carrier has a right to have each "class of Service" yield a fair return. If a fair return were 6% then for hauling each "class of service" or each commodity the carrier should get 6%. But in *Minneapolis, etc., R. Co.* v. *State of Minnesota,* 186 U. S. 257, 22 S. Ct. 900, 46 L. Ed. 1151, it was held that a carrier is not entitled to the same percentage of profit on every service; that sundry considerations make the adoption of such a rule inadvisable. See also *Northern Pac. R. Co.* v. *State of North Dakota,* supra; *Logan City* v. *Public Utilities Comm.,* 77 Utah 442, 449, 296 P. 1006.

The other line of cases to which Cardozo referred and upon which the Commission relies apparently spring from the case of *St. Louis & S. F. R. Co.* v. *Gill,* supra. In this case the State of Arkansas had prescribed a maximum rate of 3 cents per mile for each passenger. The statute gave any passenger who was charged more than this rate the right to sue for a penalty. In an action to recover such a penalty the company defended on the ground that the portion of its road (which had at one time been a separate integrated railroad company) over which plaintiff was car-

[11]See *Brooks-Scanlon Co.* v. *Railroad Commission,* supra; *Broad River Power Co.* v. *State of South Carolina,* 281 U. S. 537, 50 S. Ct. 401, 74 L. Ed. 1023; *Vandalia R. Co.* v. *Schnull,* 255 U. S. 113, 41 S. Ct. 324, 65 L. Ed. 539; *Oklahoma Gas & Electric Co.* v. *Corporation Commission, D. C.,* 1 F. Supp. 966; *Nodfolk & W. R. Co.* v. *Conley,* 236 U. S. 605, 35 S. Ct. 437, 59 L. Ed. 745 (a companion case to the Northern Pac. R. Co. v. North Dakota, Case); *Kansas City, C. C. & St. J. R. Co.* v. *Barker, D. C.,* 242 F. 310.

ried was highly expensive to construct and maintain, and that the cost of maintenance and transportating passengers over it exceed the maximum rate fixed by law. The court held that

"the correct test was as to the effect of the acts on the defendant's entire line, and not upon that part which was formerly a part of one of the consolidating roads; that the company cannot claim the right to earn a net profit from every mile, section, or other part into which the road might be divided, nor attack as unjust a regulation which fixed a rate at which some such part would be unremunerative; * * * and, finally, that, to the extent that the question of injustice is to be determined by the effects of the act upon the earnings of the company, the earnings of the entire line must be estimated as against all its legitimate expenses under the operation of the act within the limits of the state of Arkansas." [156 U. S. 649, 15 S. Ct. 491, 39 L. Ed. 567.]

In distinguishing this St. Louis & S. F. R. Co. v. Gill case from the case of *Northern Pac. R. Co.* v. *State of North Dakota,* supra (relied on by Mountain States), the Supreme Court stated in said latter case at page 435 of vol. 35 S. Ct.:

"In St. Louis & S. F. R. Co. v. Gill, * * * a statute fixing a maximum rate for passengers in the state of Arkansas was challenged, but the allegation and offer of proof that the rate would compel the carriage of passengers at a loss related only to a portion, or division, of the railroad, and not to the result of all the traffic to which the rate in question applied. The holding that this was insufficient was in entire accord with the above-stated principle,—that the rate-making power may be exercised in a practical way, and that the legislature is not bound to assure a net profit from 'every mile, section, or other part into which the road might be divided.' * * * A passenger rate may apply generally throughout the state, and the effect of the rate must be considered with respect to the whole business governed by the rate."

This problem was discussed in *Los Angeles & S. L. R. Co.* v. *Public Utilities Comm. of Utah,* 80 Utah 455, 15 P. 2d 358, 360, from the standpoint of determining whether a railroad should be permitted to abandon a service. We there stated:

"A railroad cannot be required to perform the actual services of transportation for which it is constituted at a loss, but that does not mean that every service or facility embraced or involved in the transportation must itself be made to pay or else be discontinued. It is somewhat a matter of degree, and whether the service is severable from its integrated business of transportation."

There are no clear-cut signposts set out in the cases by which it can be ascertained when a different "class of traffic" within the meaning of the Northern Pac. Ry. v. State of North Dakota case is involved. In that case the court stated:

"The legislature undoubtedly has a wide range of discretion in the exercise of the power to prescribe reasonable charges, and it is not bound to fix *uniform rates for all commodities, or to secure the same percentage of profit on every sort of business.* * * * Nor is its authority hampered by the necessity of establishing such minute distinctions that the effective exercise of the rate-making power becomes impossible. *It is not bound to prescribe separate rates for every individual service performed, but it may group services by fixing rates for classes of traffic.* * * *" (Italics added.)

In *Norfolk & W. R. Co.* v. *Conley*, 236 U. S. 605, 35 S. Ct. 437, 438, 59 L. Ed. 745 (companion case to the Northern Pac. Ry. Case), the court stated that the fundamental question there presented was whether the validity of a passenger rate could be determined by its effect upon the passenger business of the company considered separately. In this regard the court held:

"The passenger traffic is one of the main departments of the company's business; it has its separate equipment, its separate organization and management, and, of necessity, its own rates. In making a reasonable adjustment of the carrier's charges, the state is under no obligation to secure the same rate of return from each of the two principal departments of business, passenger and freight; but the state may not select either of these departments for arbitrary control."

In Spurr, Guiding Principles of Public Service Regulation, Vol. 3, p. 188, this problem is analyzed and the various

leading cases are discussed. Spurr concludes that:

"From an examination of the cases on this subject it will be seen that there are two angles from which the question of reasonableness of the return as a whole may be viewed. One may consider the rights of the company or the rights of various classes or rate payers. Viewed as a company question it is purely a question of return. Viewed as a rate payer's question it is a question of discrimination. It is very true that if a company is earning a reasonable return from the whole body of its rates, it has no ground for claiming that its property is being confiscated; but if it were shown that the rates for certain parts of the service were not producing a reasonable return on the property devoted to it, other rate payers might reasonably object that they were paying more than their fair share of the return; that losses for one branch of the service, for example were being recouped at their expense."

Spurr then discusses the problem from the viewpoint of the various types of utilities including telephone companies. He concludes that the method of regulation usually adopted as to telephone companies is the statewide basis. The majority of authorities cited in support of this proposition are decisions by various state commissions. In discussing why the state-wide basis is used, the New York Commission in *Stone* v. *New York Telephone Co.,* P. U. R. 1921D, 736, stated:

"The value of this company's property used and useful in the public service, its rates charged and its regulation, so far as regulation can go in the matter of policies and practice, should be considered on the basis of its state-wide activities, that the forced and artificial segrations attempted in this case do not afford a satisfactory basis for proper determination of either valuations or rates; and that the availability of service and its development to the highest possible degree, irrespective of municipal boundaries, are essential to that character of telephone service which the public demands."

On an application to increase rates, in Re Polo Mutual Telephone Company (Ill.) P. U. R. 1916B, p. 318, the commission held that neither a separate valuation of city, rural, or telephone plants nor the cost of each class of service is necessary in fixing rates where the entire plant is

operated as a unit and all subscribers have equal use or access to all facilities.

In *Public Service Commission* v. *Chesapeake & Potomac Tele. Co.*, P. U. R. 1925B, p. 545, the Maryland Commission held that:

"The fair value of and the revenue derived from all the telephone property in Maryland, held under a common ownership, ought to be considered in determining whether rates for telephone service are fair or unfair, and that on this basis the Commission finds that the owners of the telephone property in Maryland receive a reasonable return on the fair value of their property."

The case resulted from filing of a new schedule of rates with the Commission.

Other Commissions have followed this same rule in telephone cases.[12] E. D. Smith in his book "A Telephone Rate Case," 1941, p. 125, after a discussion of the various cases affecting this question, including the Northern Pac. case, stated:

"But as to telephone companies, it may be well to observe that the usual method of regulation adopted by commissions is the state-wide basis."

One might reasonably ask why exchange and toll service are not considered to be separate classes of traffic within the meaning of the Northern Pac. Ry. case, and why it is the uniform practice to adopt the state-wide basis of regulation in regard to telephone utilities. This problem whether the various services rendered by a telephone utility are fundamentally different classes of service)

---

[12]*In re Southern Bell Tel. & Tel. Co.* (Ga.) P. U. R. 1921C, 833; *Public Ser. Comm* v. *Mountain States Tel. & Tel. Co.* (Mont.) P. U. R. 1924C 545; In re New York Tel. Co. (N. Y.) P. U. R. 1922A, 497; In re Southern Bell Tel. &. Tel. Co. (N. C.) P. U. R. 1921D, 447; In re Pacific Tel. & Tel. (Or.) P. U. R. 1922C, 248; In re Uniform Telephone Rates, (Pa.) P. U. R. 1917D, 259; *New Castle* v. *Bell Tel. Co.* (Pa.) P. U. R. 1921B, 378; *Department of Public Works ex rel. Seattle* v. *Pacific Tel. & Tel. Co.* (Wash.) P. U. R. 1923D, 113; In re Chesapeake & P. Tel. Co. (W. Va.) P. U. R. 1921B, 97. Contra: In re Northeast Kan. Tel. Co., P. U. R. 1916B, p. 925.

was not made the subject of direct inquiry by the Commission. However, from the evidence we ascertain that Mountain States furnishes many individual types of services including both telephone and non-telephone services. The non-telephone services include such things as radio program transmission, teletypewriter, etc. The telephone services are primarily designated as toll and exchange. Both toll and exchange include numerous subdivisions.[13] It is not entirely clear how far Mountain States would have the Commission go in establishing rates on each of these individual types of service. Possibly it would not urge that rates should be fixed so that each type listed in the footnote when considered separately would yield a fair return. But at least as to toll and exchange Mountain States insists that each must have a rate that will yield a fair return when considered separately. With this we are unable to agree.

Toll and exchange services are both carried on through the use of the same property and appliances to a large extent. A telephone in a home can be used and is used interchangeably for both toll and exchange. The uncontradicted testimony is to the effect that the type of service rendered is essentially the same. Both transmit the same commodity. In this regard a telephone utility at least as to its telephone services is fundamentally different from a railroad. For example in railroad operations passenger and freight are essentially two different services. The type of service rendered is materially different in types of accommodation required, equipment used, the risk involved, etc.

---

[13]For example toll service includes station to station and person to person toll calls; both of which are subdivided into night or off-peak service and day or peak service. A report charge is made on incomplete person to person calls. Exchange service covers a number of special classes including residence and business service; private and multi-party service on both residence and business phones; private branch exchange service, extension, short term, and suspended service. Also there are charges made for installation, moves and changes; public pay stations, etc.

A situation in the railroad field more nearly comparable to telephone services would be where a road was exclusively a passenger carrier. In its passenger service their undoubtedly would be different types of services—such as day coaches, pullman compartments, drawing rooms, private cars, etc. Meals would be served on the train. There would also be baggage service, red caps, etc. The passenger service might be divided into first, second and third class—on Streamliners or Challengers. There would be main lines, switching yards, ticket offices and depots. No one could successfully urge that each of these individual passenger services must yield a fair return when considered separately —the main consideration would be whether or not the passenger service as a whole would yield a fair return.

Whether the telephone service rendered is to be designated toll or exchange seems to be merely a question of operational convenience rather than one of some fundamental differences in the type of service rendered. One relatively large area where the available traffic is small may be served with but one exchange and all service on calls within the area be denominated exchange service. Another area comparable in size might have sufficient traffic to warrant the establishment of two exchanges and the service between the exchanges might be denominated toll. The difference is one of degree only. The difficulties which would be encountered in attempting an artificial separation and apportionment of properties used in exchange and toll are almost insurmountable. Such a separation and apportionment should not be required unless necessary to the recognition of appropriate regulatory authorities; for toll and exchange are not essentially separate and distince classes of traffic but are merely individual types of services. The administrative practice of the various regulatory authorities over the nation supports this view.

It must, however, be kept in mind that from the viewpoint of the public this becomes a question of discrimination. The commission could not for instance require toll

service to be rendered free and allow the telephone company to recoup the loss by charging excessive exchange rates. Rates should be established that will as near as possible, from an administrative viewpoint, yield a fair return on the property used in rendering each class of service. It is true that all subscribers have equal access to all the facilities, both toll and exchange, but each subscriber does not take advantage of each service to the same extent. The public is therefore interested in seeing that the differences between toll and exchange rates in relation to the costs of rendering each service, the value of each service, etc., are not so great as to constitute an unwarranted discrimination between the toll and exchange user. If in order to remove alleged discrimination between interstate and intrastate toll, it is necessary to create flagrant discriminations between toll and exchange, nothing has been gained. Since the matter must be reversed for further inquiry as to what will be a reasonable rate for intrastate toll service it is assumed that the commission will not overlook this factor in establishing the new rate.

In regard to these various issues it appears that to a certain extent the Commission has lost sight of one important point. It is this: If Mountain States operating jointly with A. T. & T. has voluntarily set an interstate rate which will not yield a fair return on the property used in furnishing that service—that is, if interstate service is rendered at a rate lower than would be necessary to cover costs of operation in this area—it is not necessarily the Utah intrastate subscriber who is discriminated against. If the Utah commission keeps intrastate rates, both toll and exchange, at a point where the utility will be able to *just* make a fair return, so that none of the loss from interstate operations is recouped from higher intrastate rates, then the Utah intrastate subscriber cannot complain for the loss is not passed on to him. The Utah interstate user may be getting a rate lower than the cost of service rendered to him justifies. If so Mountain States may be making up

this loss, not from charging the Utah intrastate subscriber more, but by charging the subscribers in other areas in the nation more than the service rendered to them would cost or justify if considered by itself. Yet because of administrative considerations, the F. C. C. has apparently held that such discrimination against these other subscribers in favor of the Utah interstate toll user which results from basing rates on average costs over the nation as a whole is a reasonable one.

The issues raised in regard to report charges also fit into this pattern of reasoning. The evidence seems to support the view that some charge would be justified from the standpoint of services rendered. In the case of an incomplete intrastate person to person toll call a report ■ charge is made; but for such an incomplete interstate call no direct report charge is made. The witnesses for Mountain States frankly admitted that there was no differences between interstate and intrastate toll service which would justify the making of a report charge in one case and not in the other. So far as the telephone company is concerned it should not care whether the cost of rendering this service is assessed directly as a report charge or whether it is included in toll rates or exchange rates. Our discussion on the issue of confiscation shows that the telephone company's primary concern should be in making a reasonable return on its statewide operations. But the public has a vital interest in this matter. Under the order of the Commission, Mountain States must discontinue making report charges. The total operation cost of rendering report service would continue just as it does now—perhaps it would increase because of a greater use of the service which the Commission's order would make free to the user. This loss which would inevitably result from rendering this service without charge to the user would of necessity have to be recouped from revenues received from rendering other services. If it were to be passed on to the exchange user he would be forced to pay a higher rate so that the person

using the report service would be able to get this service free. Thus, while the commission might seek to remove a discrimination between the interstate and the intrastate user of report services, it would have created another one equally objectionable between the intrastate user of report services and the subscriber from whom this loss in revenue to Mountain States would be recouped. While Mountain States might not be able to complain of this part of the order if its overall returns remained sufficient to yield a fair return, the public could complain and the order requiring the discontinuance of the making of report charges is, therefore, arbitrary.

Mountain States complains that the commission refused to allow it to make a comparison between its toll business and that of the other independent companies operating in Utah. As pointed out above, rates charged elsewhere under similar conditions are evidentiary of the reasonableness of rates in issue. But the comparison is of little value unless a similarity of service and conditions is shown. Though this is true, it has been held that proof of this similarity between the rates offered, and those in issue, is not a prerequisite to the introduction of the rate offered. *H. L. Halliday Milling Co.* v. *Louisiana, etc., R. Co.*, 80 Ark. 536, 98 S. W. 374; *Public Service Commission* v. *Northern Cent. R. Co.*, 122 Md. 355, 90 A. 105; *Public Service Commission* v. *Baltimore, etc., R. Co.*, 122 Md. 393, 90 A. 119; *Interstate Commerce Commission* v. *East Tennessee, etc., R. Co.*, C. C., 85 F. 107.

A different view has prevailed, however, in other jurisdictions wherein it has been held that the reasonableness of the rates in one state cannot be tested by a comparison with the rates in other states unless a similarity of conditions is first shown between the rates compared. *Anniston Mfg. Co.* v. *Southern R. Co.*, 145 Ala. 351, 40 So. 965; *Hopper & McNeil* v. *Chicago, etc., R. Co.*, 91 Iowa 639, 60 N. W. 487.

The showing of similarity might go only to the weight of the comparison sought to be made and not to the admissibility of the evidence. But in any event it was error not to allow Mountain States to make this comparison in this case. The commission itself based its entire case on a comparison with another rate: to wit, Long Lines interstate rates. It held that differences in operating conditions, average costs, area served, density of traffic, etc., were immaterial. But when Mountain States tried to make a similar comparison with the rates of other independent companies operating in Utah, the Commission held that this could not be done because no showing had been made that these overrates were applicable to similar operating conditions, served similar areas, had same density of traffic, etc. This was arbitrary and unreasonable.

This leaves only the question as to whether the Commission gave Mountain States a fair and impartial hearing. The contention that it did not is based upon the fact that the Commission verified a complaint in which it alleged that Mountain States intrastate rates were in violation of law and were unjust, unreasonable, and unlawfully discriminatory. Similar allegations were made in regard to the making of report charges and the differences in rates for overtime periods, person to person toll calls, etc.

In the verification of this complaint the Commission swore that these allegations were true to the best of its knowledge. Mountain States contends that this shows that the Commission prejudged the case. This practice of swearing to a complaint in which the very issues to be resolved are alleged as ultimate facts is certainly not to be commended. If this in fact shows prejudice it could not be cured by the filing of a new unverified complaint. If there were prejudice, the filing of such a new complaint could not remove that prejudice from the minds of the Commissioners. The present members of the Commission would be disqualified to hear this case. However, swearing that these allegations were true to the best of their

knowledge is not the equivalent to swearing that they had knowledge that the allegations were true. The hearing was for the purpose of developing their knowledge. We do not think that this verification by itself is sufficient evidence to show that the Commission was prejudiced or that it pre-judged the case. The record as a whole does not indicate that Mountain States was deprived of a fair hearing.

The order of the Commission must be set aside and the matter remanded to the Commission for a determination as to what would be a reasonable and just rate for intra-state toll service. Such is the order.

LARSON, McDONOUGH, MOFFAT and WADE, JJ., concur.