Argued December 13, 1960, remanded October 25, 1961, petition for
rehearing denied January 5, 1962

# THE PACIFIC TELEPHONE AND TELE-
# GRAPH COMPANY *v.* HILL, PUBLIC
# UTILITY COMMISSIONER

365 P. 2d 1021
367 P. 2d 790

*Norman A. Stoll,* Special Assistant Attorney General, Portland, argued the cause for appellant. With him on the brief were Robert Y. Thornton, Attorney General of Oregon, and Lloyd G. Hammel and Irving C. Allen, Assistant Attorneys General, Salem.

*Richard Devers,* Portland, argued the cause for respondent. With him on the brief were Hart, Rock-

440

wood, Davies, Biggs and Strayer and Dean G. Ostrum, Portland.

Before McAllister, Chief Justice, and Rossman, Warner, Perry, Sloan, O'Connell and Goodwin, Justices.

ROSSMAN, J.

The plaintiff-respondent is the Pacific Telephone and Telegraph Company which renders telephone service in this and other states. The defendant-appellant is the Public Utility Commissioner of Oregon. When the company filed new tariffs and complained that existing rates were confiscatory the commissioner conducted hearings resulting in the order under review. The order prescribed new rates and charges, but in amounts less than the company sought. This is an appeal by the commissioner from a decree of the circuit court that sustained the company's contentions. The present commissioner is not the one who entered the order, although that fact is inconsequential.

Pursuant to ORS 757.220 the company on May 28, 1958, filed with the commissioner new tariffs which sought increases in intrastate telephone rates. At that time the company was earning upon its investment in plant, material and supplies devoted to Oregon intrastate operations a return of 5.42 per cent. The earning was computed upon results achieved in a test period of twelve months which ended June 30, 1958, and was based upon the average investment of the period ($130,630,920). Had it been computed upon investment at the end of the period ($134,664,567) the return would have been 5.26 per cent. The tariffs which the company filed May 28, 1958, sought in-

creases in (a) the company's gross revenues to the extent of $4,858,000, (b) its net revenues to the extent of $2,118,000 and (c) its rate of return upon investment in plant, material and supplies so that it would yield 7.04 per cent. The tariffs would have increased rates for intrastate exchange telephone service, intrastate toll service and for some miscellaneous services. By "exchange telephone service" we mean local calls, that is, calls that can be made without the payment of long distance charge. By toll service we mean long distance calls that require the payment of a sum in addition to the monthly charge which all subscribers pay. The "miscellaneous services" are unimportant in this appeal.

The commissioner suspended the new tariffs and in the meantime conducted the hearings which we have mentioned. Upon their close he entered the order which was under attack in the circuit court when the company appealed from it. The latter granted an increase in the company's intrastate gross revenues of $759,097 in lieu of the sum of $4,858,000 sought by the company. In making the reduction the commissioner treated investments in plant of $6,194,-114, which the company deemed devoted to intrastate operations, as non-intrastate and $423,328 of expenses in the same way. The order employed $126,794,131 tentatively (the average investment for the twelve month test period) as the rate base; but after striking from it the sum of $6,194,114, reduced it to $120,600,-017. The commissioner determined that the company's net operating revenue for the test period was $6,903,-655, and ruled that a fair rate of return upon the company's investments in intrastate plant was 6.35 per cent. The latter is more than the return of 5.42 per cent which the company was earning at that

time. The company thereupon filed the appeal to the circuit court under ORS 756.580. The court's decree sustained every major contention of the company. From it the commissioner appealed to this court.

Both parties agree that the burden of proof to establish that existing rates were confiscatory and that the proposed rates would be reasonable rested upon the company. But it will be noticed from the facts just recited that the commissioner granted an increase in rates to the company. It will also be noticed that he held that the existing rate of return, 5.42 per cent, was confiscatory and that the company was entitled to a rate of return of 6.35 per cent upon its investment in assets devoted to intrastate telephone service. Those facts indicate that the commissioner found that the company had discharged the burden of proof that rested upon it. Of course, they do not show that the company proved to the satisfaction of the commissioner that the schedule of rates which it sought was reasonable in its entirety.

■■ The company's Oregon telephone plant renders intrastate and interstate service. It does not have two plants—one for intrastate and the other for interstate calls—but most of its equipment, such as the telephone that stands upon a subscriber's desk, serves both intrastate and interstate purposes. The commissioner has jurisdiction over intrastate rates only and therefore it is necessary to separate the property that constitutes the plant into its intrastate and interstate aspects in order to ascertain the value of the property that serves intrastate calls. The value just mentioned must be determined because it comprises in large part the rate base upon which intrastate rates are computed.

A part of the company's plant consists of trans-

iting circuits, that is, long distance lines that cross the state and have no terminal in it. They are used for interstate calls only and the company assigned them to the part of its plant over which the Federal Communications Commission has jurisdiction. The defendant does not challenge the company's action in so doing. But virtually all of the remainder of the company's property one moment serves an intrastate call and the next moment may be used for interstate business. The average telephone in Oregon is in use only 28.07 minutes out of the 24 hour day. Of the 28.07 minutes in which the average telephone is in use 27.22 of those minutes are employed in handling intrastate calls and only 0.85 of a minute (51 seconds) in serving interstate business. Thus, the interstate calls represent 3.03 per cent of the total minutes consumed by calls. It must not be inferred, however, that the interstate calls account for 3.03 per cent of the plant's use. Although the average telephone is in use only 28.07 minutes per day, other parts of the company's plant, such as telephone lines and central office equipment, may render much more service. For example, some telephone wires serve two telephones.

■ In *Pacific Telephone and Telegraph Co. v. Thomas,* 13 PUR (NS) 337, the circuit court of our state declared:

"\* \* \* Property separately used must be separately allocated; property jointly used must be allocated on the basis of use."

*The Minnesota Rate Cases,* 230 US 352, 33 S Ct 729, 57 L Ed 1511, in referring to separations, held:

"In support of this method, it is said that a division of the value of the property according to gross earnings is a division according to the 'value of the use,' and therefore proper. But it would

> seem to be clear that the value of the use is not shown by *gross* earnings. The gross earnings may be consumed by expenses, leaving little or no profit. * * *"

Consequently, it was the duty of the commissioner not only to make a separation, but, in so doing, to allocate each item of property or the appropriate fractional part thereof to the intrastate category or the interstate category according to the use to which the item was devoted day by day.

The company concedes that the commissioner made a separation, but urges that in so doing he did not accept as his criterion the use to which the property was devoted.

Upon this appeal the company accepts the amount of $126,794,131 as its intrastate rate base. We shall presently show that although the commissioner started with that figure he made adjustments to it whereby it became $120,600,017. The company also accepts for the purposes of this appeal $6,903,655 as its net operating revenue in the test period that we mentioned. However, the commissioner, as we shall see, made adjustments to that sum. We have mentioned that the commissioner found that a fair rate of return for the company upon its investments in intrastate plant was 6.35 per cent and that the company had sought a return of 7.04 per cent. The company does not challenge 6.35 per cent as a fair return.

■ A preceding paragraph states that the commissioner reduced the company's intrastate rate base from $126,794,131 to $120,600,017 thus striking from it $6,194,114. The rate base represents the invested capital upon which the utility is entitled to earn a return. We have seen that the commissioner deter-

mined 6.35 per cent as the rate of return to which the company was entitled. By striking from the company's rate base $6,194,114 the commissioner ruled that the company was not entitled to receive any return from its intrastate operations upon that amount of invested capital. He made no finding that the part of its plant which was represented by the figure $6,194,114 did not serve intrastate operations and none that that part of its plant served interstate calls. Lest the facts be misunderstood, we add that no one contends that the sum just mentioned ($6,194,114) is not invested in the plant, nor does any one say that the company is not entitled to earn a return upon it. In the same manner the commissioner struck from the expenses and taxes which the company claimed it incurred in its intrastate operation, $423,328. The company submitted records showing that the expenses and taxes to which it was subjected in rendering intrastate telephone service amounted to $45,380,950. By deducting from that sum $423,328 the company's expenses attributable to intrastate telephone service were reduced to $44,957,622. The commissioner did not rule that the company was not subjected in the conduct of its business to taxes and expenses totaling $45,380,950 including the sum of $423,328, but held that it could not look to its intrastate operations for the stricken sum ($423,328). He made no finding that those expenses were incurred in the conduct of its interstate business.

We have just taken note of the fact that the defendant struck from the company's rate base $6,194,-114. We have also noticed that the commissioner made no finding that the equipment represented by that sum of money does not render intrastate telephone service. He went no further than to rule that

the company was not entitled to any return from its intrastate telephone service upon that part of its plant. If we multiply $6,194,114 by 6.35 per cent (the rate of return which the defendant ruled the company is entitled to receive) we have $393,326.24, representing the sum which the company would receive from that part of its plant if the commissioner had not ruled that it was entitled to charge its intrastate business nothing whatever for the services which those $6,000,000 of its equipment render to its intrastate business. We also mentioned that the commissioner struck from the total expenses of $45,380,950 which the company says it incurs annually in rendering intrastate telephone service $423,328. Although the commissioner denied to the company the right to include that sum in its total intrastate expenses he made no finding that the company does not incur that sum in rendering its intrastate telephone service. When we add $393,326 to $423,328, we have $816,654 as part of the reduction in the company's revenues which results from the contested order.

██ It is clear that if the part of the company's plant which is represented by the sum of $6,194,114 actually renders intrastate service, then the commissioner's ruling which denies the company any compensation whatever for the use of that part of its plant in intrastate service is confiscatory. Likewise, since no one denies that the company incurs $423,328 of expenses and taxes in the conduct of its business, a denial to it of the right to charge its intrastate business with that sum of money is confiscatory if those expenses and taxes are incurred in the conduct of its intrastate business. The company's witnesses established, at least prima facie, that the part of the plant represented by the sum of $6,194,114 was devoted to intra-

state service and established in like manner that the above expenses and taxes of $423,328 were incurred in the operation of its intrastate plant.

The commissioner's challenged order, if given effect, will yield to the company only $331,118 of new net revenue. If we accept $126,794,131 as the rate base, additional net revenue of $331,118 will yield to the company a return of only 5.71 per cent which is less than the commissioner deemed necessary to prevent confiscation.

■■ It is seen from the foregoing that the commissioner struck from the properties which the company asserts constitute its intrastate plant $6,194,114 and struck from the expenses and taxes which it says are incurred in its intrastate operation $423,328. The investments totalling $6,194,114 were stricken from the company's rate base under a belief that although those properties render telephone service they should receive no remuneration from intrastate operations. Since no one contends that those properties do not exist or that they are not in daily active operation, the commissioner evidently believed that they should look to the company's interstate business for remuneration. But he made no finding, as we have seen, that those properties serve the company's interstate operations; and the record contains no evidence which could support a finding to that effect. The same observations are true concerning the sum of $423,328 which the commissioner struck from the taxes and expenses which the company showed it incurred in the operation of its intrastate business.

Mr. Curtis M. Bushnell of Hyatsville, Maryland, a public utility consultant, as a witness called by the commissioner, gave testimony concerning the allocation of the company's properties between its intra-

state and interstate operations. Before becoming a witness he had acquainted himself with the company's operations, revenues and expenses. He prepared an exhibit from which we quote the following:

"INTERSTATE

1. Average net plant investment plus material and supplies allocated to intrastate operations by company, Ex. 14 .................................................. $ 130,630,920

2. Revised average net plant plus material and supplies allocated to intrastate operations ........................ 124,313,350

3. Increase in average net plant plus material and supplies allocated to interstate operations (1 — 2) ...... 6,317,570

4. Return on average net plant plus material and supplies allocated to interstate operations by company, per interstate data in Ex. 6, Col. D 6.44%

5. Amount of additional net earnings requirement from interstate to maintain interstate earnings at going level (4 × 3) ............................ $ 406,852

6. Additional net earnings requirement plus license fees and taxes on income (227.27% × $406,852) 924,653

7. Additional expenses and taxes other than income taxes allocated to interstate .......................................... 1,068,750

8. Increase in interstate revenue requirements (6 + 7) .......................... 1,993,403

9. Interstate revenues for test period, Ex. 6, Col. D, Page 1 ........ 19,648,901

10. Percent increase in interstate revenue requirements (8 ÷ 9) ............. 10.15%"

The percentage 227.27 employed by Mr. Bushnell in the sixth above quoted item constitutes, according to him, "Ratio of revenues to earnings."

It is seen from the above that if the company's investment in the amount of $6,317,570, which it deems devoted to intrastate service, is transferred to interstate, the company will have to increase its interstate revenues 10.15 per cent in order to maintain its present rate of return (6.44 per cent). Rates for interstate service are fixed by the Federal Communications Commission upon a uniform nation-wide basis. Our commissioner has no jurisdiction over them. They are a given sum per mile regardless of the location of the two places between which the call is made. If the company can not secure an increase in its interstate rates $6,194,114 of its invested capital will bring it a return from neither intrastate nor interstate operations. Likewise, if the company can not secure an additional increase in interstate rates replacing the $423,328 of expenses which the commissioner struck from its total intrastate expenses the company will have to bear those losses itself. In "Separation of Company Property for Interstate Telephone Rate Regulation," 54 Columbia Law Review 431, the writer states:

> "* * * the state commission cannot directly shift the burden of maintaining telephone property from intrastate to interstate users, for the FCC and the federal courts are the final arbiters in fixing interstate rates. Any lowering of intrastate rates must therefore be accomplished at the expense of the telephone company, denying the company a return on a portion of its investment: * * *"

The rejection by the commissioner of $6,194,114 of property as nonintrastate in character and $423,328 of expenses for the same reason was made by him in the separation of the properties. We therefore pro-

ceed to the issue of separation which in this case is its turning point.

In making the separation of the company's property it is necessary to begin with the telephone in the subscriber's home or that stands upon his desk. *Smith v. Illinois Bell Telephone Co.*, 282 US 133, 51 S Ct 65, 75 L Ed 255.

■ We have mentioned that the parties are agreed that separations must be made on the basis of the use to which the property is put. The commissioner's brief states: "At the outset it should be emphasized that the Commissioner has not denied the necessity for basing separations on relative use." The property which is subject to separation is that which is "actually used and useful for the convenience of the public." ORS 757.055. In the *Minnesota Rate Cases,* 230 US 352, 33 S Ct 729, 57 L Ed 1511, Mr. Justice Hughes ruled:

> "When rates are in controversy, it would seem to be necessary to find a basis for a division of the total value of the property independently of revenue, and this must be found in the use that is made of the property. * * *"

The commissioner presents no contention that the company, in computing its rate base, included the value of any item of equipment that was not used in rendering telephone service. We see from the foregoing that "use" is the test which must be employed in determining the extent to which each item of equipment was devoted day by day to intrastate and interstate service.

The company made its separation by following the rules set forth in the Separations Manual which was written by the National Association of Railroad and

Utilities Commissioners (NARUC). That organization is composed of (1) the public utility commissioners of the various states, including Oregon, that regulate telephone rates, and (2) representatives of the Federal Communications Commission. The manual points out the manner for making a separation such as the one required in this case. One of its rules is: "The fundamental basis on which separations are made, is the use of telephone plant in each of the operations."

■ Although the manual has won the approval of the utility commissioners of various states and is employed by the Federal Communications Commission, it is clear that the defendant was not required by any statute, rule of law or any provision of our Constitution to follow it. He was at liberty to disregard it if he could not concur in any of its rules. *Hillman v. Northern Wasco County P.U.D.*, 213 Or 264, 323 P2d 664.

The commissioner did not deem himself bound to follow the manual and did not believe that adherence to it would produce a reasonable result. We have seen that he was at liberty to adopt that attitude. He recognized that use was the gauge which he must employ in allocating the many items of equipment and property into the intrastate and interstate categories.

We will now take note of the evidence which indicates the manner in which separation was actually made and which reveals the rules which guided the commissioner in making it.

Mr. Bushnell testified:

"The end result is the only test you have on cost allocations. There is no way to tell how much

should be intrastate and how much should be interstate. The only test you have is the end result."

The commissioner's findings state: "The acid test of any regulatory action is the reasonableness of the end result." Neither Mr. Bushnell nor the commissioner mentioned any criterion or yardstick by which any one may know whether a rate is reasonable that has been fixed by "the end result" method. Rates must be "just and reasonable," ORS 757.210.

Mr. Bushnell, as a witness, expounded upon a method of rate fixing of which we will now take notice. This method stemmed largely from the fact that in instances a disparity exists in favor of interstate rates when a comparison is made between the charge which the company makes for an interstate call and the charge that it makes for an intrastate call of the same or shorter length. For example, the company's rate from Portland to Ontario, Oregon, is $1.57 whereas its rate from Portland to Boise, Idaho, 67 miles beyond Ontario, is $1.45. Its rates from Portland to Pendleton and from Portland to Spokane, approximately twice the distance, are identical, $1.40. Other instances were mentioned during the hearing including at least one in which the intrastate rate was less than the interstate. The commissioner thought that the disparities were "intolerable." One of his findings declares that the disparities are the "product of separations procedures which have been quite generally conceded to throw upon intrastate operations an undue proportion of the burden of increasing investment and expenses." Shortly his finding stated:

"The logical—indeed the obvious place to begin a search for the source of these inequities is in the processes by which the properties and expenses of the Company are apportioned between intrastate and interstate operations."

The hearing before the commissioner was concerned largely with the disparities. Although this matter had its inception with (1) the company's application for an increase in its rates and (2) its proof that existing rates were confiscatory, attention soon was centered in the disparities. The inference appears to be warranted that the commissioner assumed that they established that the intrastate toll rates were excessive. The issues can not be resolved upon the basis that a discrimination existed in favor of the company's interstate service because (1) the controversy was not tried upon any issue of that kind and (2) the rates pertaining to the disparities were casually selected and are few in number.

We deem it pertinent to take note at this point of the following observation made in *Mountain States Telephone and Telegraph Company v. Public Service Commission,* 105 Utah 230, 142 P2d 873:

"* * * If *any* reduction in Mountain States' present intrastate toll rates would confiscate its toll properties, and if, as it contends, it has a constitutional right to a fair return on its toll properties considered separately, this fact would be sufficient justification for its present toll rates. If, in fact, it does have such a constitutional right, it cannot be deprived of it merely by designating this as a discrimination case. It would not be compelled to reduce its rates to a confiscatory level merely because A.T.&T. operates at a profit on a lower rate. If A.T.&T. can operate and obtain a fair return at a given rate which, if applied to Mountain States, would confiscate its property, then this fact itself becomes a sufficient justification for some difference in rates under which the two operate. We must, therefore, determine whether or not Mountain States has a constitutional right to fair return on its toll property considered separately."

Mr. Bushnell testified:

"The main line long distance circuits usually run between the large cities of the country and they mostly carry only interstate calls * * *. Because they are the main lines it is advantageous to construct them with modern high volume facilities, a procedure which results in a much lower cost per circuit mile. They also carry a higher density of traffic which, together with the lower unit cost, produces a considerably lower cost per unit of use—that is per message mile minute."

Then, referring to the exchange and intrastate toll lines, he continued:

"* * * These branch lines are more expensive in terms of investment per circuit mile, and they operate with a lower density of traffic. Hence, the resulting cost per message mile minute is high."

Mr. Bushnell testified further:

"The Bell System has furnished data to an NARUC committee which indicates that, as of June, 1953, the investment per message-mile-minute for the associated Bell Companies, including The Pacific Company, was more than three times as high as the investment per message-mile-minute for the long distance toll network of the Long Lines Department of A.T.&T. It must be remembered that the circuits of the associated companies serve in two roles, being largely used jointly for intrastate and interstate service, while the circuits of the Long Lines Department are used for interstate service only."

The following is additional testimony that he gave:

"Q In other words, you are saying that, to your general knowledge, the book costs per circuit mile are being lowered by these new types of facilities. Is that right?

"A And they are probably being lowered faster by Long Lines than they are by the associated

companies, because Long Lines is putting in more of that backbone plant, which, by averaging out, would have made this M M M plan larger in 1957 than it was in '53.

"Q Tell me—do you know how much the Long Lines book cost for circuit equipment per circuit mile has changed between June 30 of '53 and June 30 of '58?

"A Well, I have some approximations here that aren't complete, of course.

"Q Can you tell us the source of this data that you are about to give us?

"A Well, let me give it to you this way: In 1953, Long Lines book cost was $109 a mile, circuit mile. That is from the NARUC report, 1950, page 56, Line 13. I'm sorry. That was 1950. $109 a mile.

"Q 1950.

"A (continuing) It had dropped to $60 a mile by 1953, and by June, '53, the NARUC report for 1953, on page 273, says its book cost per mile was $48.

"Q That is June of 1953?

"A Yes, sir. Now, in the recent Federal Communications Commission case it was determined that the book cost per circuit mile of outside plant of Long Lines was $17.88, and that was data as of the end of '55 or early '56."

No one gave testimony contrary to that which we just quoted, and it explains at least in part the disparity between the company's charges for interstate calls and intrastate calls of comparable distance. How much of the disparity is accounted for by Mr. Bushnell's explanation that the interstate calls are conducted in a manner that "results in a much lower cost" no one indicated.

The basis of much of Mr. Bushnell's separation method, which we will now consider, was a belief

upon his part that an interstate toll call has a value to the party who makes it three times that of an intrastate call. Such being his belief he "weighted" the company's interstate calls by a factor of 3. The effect of the weighting was to multiply the minutes of use by 3, or deem that the calls were three times as many as they actually were. We noticed that the average telephone is in use only 28.07 minutes of the day and that of the 28.07 minutes only 0.85 of a minute (51 seconds) represents the brief period per day while it is rendering interstate service. Mr. Bushnell proposed to multiply the 0.85 of a minute by 3 and thereby deem that the average telephone is engaged in interstate use 2.55 minutes each day. He makes no alteration to the 27.22 minutes in which the telephone is in intrastate use. But, by substituting 2.55 minutes for 0.85 of a minute he increases 28.07 minutes to 29.77 minutes. Having multiplied in that manner the company's interstate toll business Mr. Bushnell allocated to the interstate business a larger part of the company's expenses and taxes. He also reduced in that manner the company's intrastate rate base. The effects of multiplying by 3 the volume of the company's interstate toll business was to decrease to the extent of $4,067,109 the company's intrastate rate base and its intrastate taxes and expenses in the sum of $307,321.

It is clear that the commissioner adopted Mr. Bushnell's views; one of the commissioner's findings states:

"In support of his selection of three as his recommended weighting value, Bushnell refers to the Company's experience in Oregon showing that conversion of toll calls to flat rate exchange service increases the volume of calls three times on the shortest route and up to five or six times

on slightly longer routes, and he also refers to the fact that the average distance of intrastate toll cost in Oregon is 54 miles whereas the system-wide average distance of interstate calls (i.e. for the Bell Companies' interstate system as a whole) is over 200 miles or about four times as great. * * *"

We will shortly take further note of the finding's references to the company's "experience in Oregon that conversion of toll calls to flat rate exchange service increases the volume of calls three times," but before so doing give attention to the fact that Mr. Bushnell's proposal and the commissioner's adoption of it was not based upon any finding or evidence that equipment worth $4,067,109 which the expedient proposes to shift from intrastate to interstate rate base, was not actually used day by day in intrastate service. Likewise, the commissioner made no finding that expenses totalling $307,321 which he shifts from intrastate operations to interstate are not actually incurred in handling the intrastate calls. Further, this expedient, in making its shifts from intrastate to interstate, pays no attention to Mr. Bushnell's unchallenged and uncontradicted testimony that the interstate toll lines are better constructed and are operated at "a considerably lower cost per unit of use" than the intrastate lines. In other words, it displays no interest in that fact as a possible cause of the disparities between the rates exacted for intrastate and interstate calls of comparable length.

The basis for the double shift is a belief that an interstate call has a value at least three times as great as an intrastate call. Mr. Bushnell testified:

"What I am saying is that one minute of interstate toll use has a substantially greater value than one minute of exchange use, and that has to

be recognized in the allocation of costs in order to get a reasonable allocation."

He conceded that the Separations Manual contains no provision for separations based upon the value of calls. He also conceded that a subcommittee of NARUC April 28, 1947, rejected a proposal such as his. The proposal was never again submitted to NARUC. He testified: "My whole thesis is that one minute of interstate toll use has a substantially greater relative value than one minute of intrastate use." He deemed that a weighting factor of three was very conservative and added: "A higher weighting factor could be justified." Shortly he declared: "I believe a weighting factor of six would be justified."

■ There can be no doubt but what Mr. Bushnell and the commissioner, in multiplying by three the actual number of interstate toll calls, relied solely upon the proposition that an interstate toll call has a value three times as great as a local or intrastate toll call. Mr. Bushnell thought that the value could readily be fixed as six times that of a local or intrastate call. We will now quote from the record a few of the numerous items which warrant the statements just made.

The commissioner presented objections in the circuit court to findings which were tendered to that court by the company. In one of these objections he stated:

"The use of the weighting factor of 3 as applied in the commissioner's allocation formula is not arbitrary because * * * (b) the Commissioner adjusted for this deficiency in plaintiff's formula by taking into account the relative value of a minute of use of toll and exchange services, respectively; (c) the record shows clearly that in

general there is such a difference in value tending to increase as the distance of a call increases."

Further, the commissioner objected:

"The use of a factor of 3, in the manner this factor was used by defendant, affords a conservative and appropriate recognition of the difference in value as between a minute of intrastate use and a minute of interstate use."

The following is also taken from the commissioner's objections:

"The processes followed by the commissioner in allocation of exchange plant were * * * First, weighting by 3 each minute of interstate toll use, in order to give appropriate consideration to the greater relative value of a minute of interstate toll use as compared to a minute of intrastate use (whether exchange or toll)."

The commissioner, at the conclusion of the hearing which he conducted, entered findings which stated in part:

"Regarding failure of the allocations process to give consideration to the relative value of a minute of interstate toll use as compared with a minute of intrastate use, Witness Bushnell points out that the nature of telephone rate structures is such as to encourage exchange use to a much greater extent than toll use, particularly the longer haul toll use. The practice of basing exchange rate schedules upon flat monthly charges, with no limitation upon the number or length of exchange calls, encourages maximum and even excessive use of telephone exchange facilities for exchange service which, he asserts, includes much usage that is of lower value to the user. On the other hand, toll rate schedules—charging as they do for each call on the basis of its duration and the distance it travels—tend very strongly to restrict toll calls to those having greater value to the user. * * *

"Obviously, not every long distance call can be of greater importance and value than every local call. There are many calls made over very long distances for purely personal and even frivolous reasons to which no great value or importance can be attached, either by the individual or by society. Obviously, some local calls are so important as to affect life and death. But it is only the most elementary common sense to recognize that, on the average, the importance or value of long distance calls must be measured by those who make them, against their own willingness to pay very specific and not inconsiderable charges for each such call * * * "

We shall not quote further from the record showing that the commissioner multiplied the number of interstate toll calls by three through resort to the proposition that each of them had a value to the user three times that of a local or intrastate call. The quotations could be expanded materially, but resort to more of the commissioner's statements would accomplish nothing except to indicate that he accepted Mr. Bushnell's proposition that an interstate toll call had a value three times greater than a local or intrastate call and that he was thereby justified in multiplying by three the number of interstate toll calls. The commissioner's many statements render it clear that in making the multiplication he relied upon the assumed greater value of the interstate toll call and not upon something else.

In the brief that the commissioner filed with this court he stated (referring to himself):

"First, he assigned to each minute of interstate toll use a value three times that assigned to a minute of intrastate use (whether exchange or toll) in order to reflect its greater relative value to the user."

It is clear that the commissioner embraced Mr. Bushnell's contention that an interstate toll call has a value to the user at least three times that of a local or intrastate call. It is also clear that he multiplied by three the number of interstate toll calls upon the single basis that each of them had a value three times that of local or intrastate toll calls. He mentioned no other basis for his action.

The members of this court have given careful consideration to the contention that an interstate toll call is more valuable to the user of the telephone than a local or intrastate toll call, and that the purported greater value can justify the commissioner in multiplying the actual number of interstate toll calls by three, or even by a larger numeral such as 6.

The record does not indicate the manner in which the value of a telephone conversation can be determined. By the value of a call the commissioner meant the value to the individual who made it. Telephone calls serve a diversity of accommodations: they summon police, call an ambulance or give notice in time of a death; they permit an individual to remain home and yet talk to his friends, and likewise permit a broker to remain at his desk while he offers to his customers the merchandise that he sells; they enable an attorney, without leaving his office chair, to confer with others in various places, and likewise permit a person confined in a hospital bed to lessen the monotony of the dreary hours by talking to his friends. A glance at the advertising section of a telephone directory indicates that a telephone renders medical and many other services available at all hours. These are but a few of the instances in which a telephone brings solace to the grief stricken, comfort to those who are ill and friendship to the lonely. But in addition to

those services, the value of which can not be denoted by a dollar sign, the telephone is an aid to every one who is in business. It is impossible to determine that an interstate conversation is more valuable than an intrastate.

We surmise that toll charges, whether upon intrastate or interstate calls, restrict the number. Mr. Bushnell deplored that fact and thought that the objective of regulation should be promotion of the telephone's use. In accounting for the small use of interstate toll calls (3.03%) he said, "One of the reasons I would think would be that the charge across the country is so high, or is high enough to restrict the long-haul calling." Yet his proposal, which the commissioner adopted, shifts from intrastate to interstate $4,067,109 of rate base and $307,321 of operating expenses without any finding that the aforementioned sum of $4,067,109 represents property that serves the interstate and not the intrastate operations. Likewise, there is no finding and no hint in the evidence that the aforementioned expenses amounting to $307,-321 were incurred in handling interstate, not intrastate, calls. We remind ourselves that the figures which Mr. Bushnell compiled show that if his proposal becomes operative interstate rates will have to be increased 10.15 per cent.

Very likely when toll charges are canceled, as in the instance of extended-area service, the number of calls increases. Whenever the charge for any item of merchandise is canceled the number of takers expands. But, the removal of the price tag does not increase the value of the article from which it was stricken. We think that none of the instances which the commissioner's witnesses mentioned shows that

an average interstate call is worth substantially more than an intrastate call of comparable nature.

Notwithstanding the extensive attention which the disparities commanded during the hearing, they are not removed or altered in any degree by the commissioner's order. The following, which refers to the commissioner's order, is quoted from the appellant's (commissioner's) brief:

> "The Order resulting from these and other adjustments continued in effect the disparities already existing and recognized the justification for some increase in rates. However, by rejecting any increase whatsoever in intrastate toll rates, and by confining the allowable increase to other services, the Order in effect prevented any increase in disparities * * *."

Although relief from the disparities appeared to be the major concern of the inquiry, it is seen from the statement just quoted that they remain unaltered. The commissioner's order neither eliminates nor lessens any of them.

 We do not believe that the commissioner was justified in using the figure 2.65 minutes per day (instead of 0.85 of a minute) in determining the use which the company's interstate toll calls made of the plant.

So that we will not be misunderstood we add that the evidence affords no basis for determining the value of a call or of saying that an interstate call has a greater value than an intrastate toll call.

The parts of the company's plant, affected by the separations process just reviewed and which we held is not supported by any evidence, constitutes approximately 64.9 per cent of the total plant. Those parts consist of the telephones in the subscribers' premises, the wires or cables that connect the telephones with

the company's central office, occasional equipment such as private branch exchanges, automatic dial switching equipment in the central office and the structure that houses the dial switching equipment. We now move on to another category of the company's plant which the commissioner was also required to separate according to its intrastate and interstate character. In making the separation he departed, as he conceded, from the Separations Manual. According to the company this part of its plant constitutes 18.8 per cent thereof. The latter plus the above mentioned part (64.9 per cent) totals 83.7 per cent. The remaining 16.7 per cent is free from dispute and presents no issue.

The 18.8 per cent of the plant to which we will now give attention comprises toll lines used in handling intrastate and interstate toll calls. Specifically it consists of wires, cables, poles, microwave radio systems, amplifying stations and the equipment employed at the terminals. The commissioner was required to determine how much of this part of the company's plant should be deemed intrastate in character and how much interstate.

Much of the property just mentioned serves both intrastate and interstate calls. The company, in making the separations, followed the 1956 addendum to the Separations Manual known as the Modified Phoenix Plan. As required by the manual it assigned the long distance circuits which cross the state and have no terminal within it to the interstate category. The commissioner does not criticize that disposition of them. But there remains all of the wires, cables, amplifying stations, etc., which one moment handle an interstate call and the next moment an intrastate toll call.

The Modified Phoenix Plan which the National Association of Railroad and Utilities Commissioners adopted in 1956 and which received the interim approval of the Federal Communications Commission, constitutes an amendment to the Separations Manual. The latter, referring to this modification of the manual, states:

"These modifications, developed in more detail below, provide that in each state the costs of Associated Company interexchange message toll lines plant which is physically located within that State and is used to furnish state or interstate message toll telephone service to subscribers therein, are added to the costs of similar plant, in the same State, of the Long Lines Department of the American Telephone and Telegraph Company. The state portion of the Associated Company costs included in this total is determined by apportioning the total on the basis of the relative conversation-minute-mile use of such plant developed from traffic over first routes. The balance of such Associated Company costs is assigned to interstate. Costs of Associated Company interexchange message telephone toll lines plant which transits a state and is not used to furnish any service to subscribers in that state will be assigned, in accordance with existing procedures, to the service for which such plant is used. In accordance with the principles of the existing procedures the apportionment of expenses associated with message telephone interexchange toll lines plant follows the apportionment of the plant. * * *"

Both the company and the commissioner, in separating the facilities of the toll lines plant, which serve the dual purposes just mentioned, used a formula known as M-M-M, that is, Message-Miles-Minutes. However, the commissioner made a material alteration to the formula which is not countenanced

by the manual and which the company condemns. The manual explains the formula of M-M-M in these words:

> "The term 'conversation' (message-minute-miles) is the product of (a) the number of messages, (b) the mileage haul and (c) minutes of conversation per message."

The purpose, of course, is to secure the dimensions of the average call.

When the formula has revealed the average long distance call its dimensions are used to allocate plant and expenses between intrastate and interstate in the manner that we will presently describe.

We will now quote a passage from the commissioner's findings which shows the manner in which he made the separation of toll lines between their intrastate and interstate character. It is conceded that his method is not authorized by the manual. The following is our quotation:

> "Recognizing that all toll service is by its physical nature one unified operation, the cost of which should be allocated on the basis of a uniform cost per unit of use, Witness Bushnell recommends application of the message-mile-minute plan or MMM plan to separation of toll circuits as a means of mitigating the defects of the Company's existing procedures affecting this type of plan (Tr. 910-911). Under such a plan, as applied to Oregon, the Bell System would undertake a basic study to determine the average investment per message-mile-minute based on the Bell System total investment in toll circuit plant and the total use of that plant expressed in message-mile-minutes. Each month this unit of measurement— the system-wide investment per message-mile-minute—would be multiplied by the total of intrastate message-mile-minutes *of The Pacific*

*Company in the State of Oregon* in order to allocate the Company's actual investment in toll circuits to intrastate operations. The remainder of the Company's toll circuit investment in Oregon would be assigned to interstate operations."

Thus, it is seen that the commissioner requires the Bell System to make "a basic study to determine the average investment per message-mile-minute based on the Bell System total investment in toll circuit plant and the total use of that plant expressed in message-mile-minutes." The data entering into this "basic study" would come from the entire Bell System and would be intended to show "the average investment per message-mile-minute" of the system in long distance plant. Each month this figure, which represents "the system-wide investment per message-mile-minute," would be multiplied by the figure which represents "the total of intrastate message-mile-minute" for Oregon and in that way the commissioner would ascertain the company's investment in intrastate toll circuits in Oregon.

The company, as we have said, in making this separation, followed the manual; it confined the "investment per message-mile-minute" to the company's calls and investment in Oregon. The following is taken from the company's brief:

"As we have said, the basic feature of the M-M-M plan is that it combines the investment of all the toll lines plant in the Bell System nation-wide network and its system-wide use as measured by message-mile-minutes (M-M-M) to obtain a system-wide average investment per M-M-M. Oregon intrastate M-M-M's are then applied to this system-wide unit of investment to obtain the amount of toll lines plant allocated to Oregon intrastate operations. The remainder of the Com-

pany's actual investment in toll plant in Oregon is assigned to interstate.

"In other words, under this plan the actual investment of the Pacific Company in toll lines plant in Oregon is not used in allocating this plant to intrastate operations. Instead, the average investment of the American Telephone and Telegraph Company and 21 associated companies in toll line plant throughout the United States has been used to make these allocations. As Mr. Bushnell has testified (Tr 907-910), the mainline long distance circuits, which carry a heavy volume of interstate calls and (except in Oregon) are mostly owned by the American Telephone and Telegraph Company, produce a lower unit (M-M-M) cost than the more costly toll network which is spread throughout the State and which carries a lower density of toll traffic. Mixing the low cost interstate plant with the high cost state plant and applying the resulting unit of investment to intrastate minutes of use as proposed under the M-M-M plan substantially lowers the allocation to intrastate and correspondingly increases the allocation to interstate. * * *"

Under the commissioner's version of the M-M-M plan he assigned $2,126,925 of investment which the company had deemed intrastate rate base to interstate, and $116,007 of expenses and taxes from intrastate to interstate.

Mr. Bushnell conceded that his M-M-M plan was not new. A subcommittee of the National Association of Railroad and Utilities Commissioners rejected it some years ago. He stated that recently he testified in rate cases in Mississippi, Rhode Island, Pennsylvania and Washington. In each instance he proposed his factor of three and his version of the M-M-M plan. His proposals were not accepted in any of those states. Upon cross examination he was asked:

"* * * will you tell us, will you give us one

state of the 46 states which regulate telephone rates, give us one state that doesn't at the present time follow the Separations Manual the way Oregon has been following it."

He mentioned none; shortly counsel for the commissioner, referring to Mr. Bushnell, stated:

"I mean at most, the most you have brought out so far, is that the witness does not know of any rejection of the manual."

We quote the following from the able opinion which the circuit court wrote in this case:

"Since the defendant relied so heavily on the testimony of witness Bushnell, it is interesting to observe that Mr. Bushnell's theories and opinions have been consistently rejected by the various state regulatory agencies which he has recently appeared before. (*Washington Public Service Commission v. The Pacific Telephone and Telegraph Company*, 25 PUR 3d 18, 24-26 (1958); *Pennsylvania (Pennsylvania Public Utility Commission v. Bell Telephone Company of Pennsylvania*, 16 PUR 3d 207, 232-236 (1956)); and *Rhode Island (Re New England Telephone and Telegraph Co.*, 21 PUR 3d 178, 184-187 (1957)).

"In the Pennsylvania case the commission said:

" 'This rejection is not [only] primarily because the method employed by complainants deviates from the Manual, but also because of the apparent *lack of merit of the methods employed.*' (Emphasis supplied—*PUC v. Bell Tel. Co. of Pa.*, 16 PUR 3d 207, 236 (Pa. PUC 1956))

And in the Washington case:

" 'The proposed weighting of three to a minute of interstate toll use is derived by the judgment of the witness that this method will produce a more reasonable allocation of exchange plant than does the present method. To adopt such a weighting, we must assume not only that the standby time when a telephone is available for use is

relatively three times more valuable for interstate than for intrastate toll use but also that minute of interstate use is relaively [sic] three times greater in value than a minute of intrastate toll use. *Such basic assumptions are not supported by this record.* (Emphasis supplied—*PSC v. Pacific Teleph & Teleg Co.,* 25 PUR 3d 18, 25 (Wash. PSC 1958))' "

We add that the Washington commission also rejected the M-M-M plan.

The issue now presents itself as to whether the commissioner, in dealing with the part of the plant which comprises the intrastate long distance lines, properly embraced Mr. Bushnell's M-M-M proposal, and thereby transferred rate base in the amount of $2,568,019 and expenses totalling $211,382 from intrastate operations to interstate. An inference is warranted that the commissioner, in taking the action just mentioned, was persuaded by a belief that the disparities which he sought to remedy resulted from thrusting upon intrastate operations an unfair amount of the company's expenses. The commissioner very likely believed that if the intrastate operations were relieved annually of a greater amount of expenses and rate base the disparities before long would be corrected.

In preceding paragraphs we quoted from testimony given by Mr. Bushnell which shows that the interstate lines are built better than the intrastate lines and that they are operated in a manner so superior to that of the local lines that they yield "a considerable lower cost per unit of use." Mr. Bushnell also swore that the interstate toll lines "carry a higher density of traffic, which together with the lower unit cost, produces a considerable lower cost

per unit of use." We quoted other assertions of like kind from him. They go to the very heart of this case. No one contradicted, challenged or qualified this part of Mr. Bushnell's testimony. Our reading of it creates the impression that the superior construction and operation of the interstate toll lines may explain in whole or in part the disparities.

If the interstate lines can be operated at "a considerable lower cost per unit of use," and if, as Mr. Bushnell swore, "the investment per message-mile-minute for the associated Bell Companies, including the Pacific Company, was more than three times as high as the investment per message-mile-minute for the long distance toll network" those circumstances may account in part, at least, for the disparities. Mr. Bushnell gave his data and facts while explaining his M-M-M proposal. If the interstate toll lines are built and operated in such a superior manner that interstate toll rates are lower than comparable intrastate toll rates, it would be wrong to cast upon the interstate operations a part of the cost of the operation of the lower standard intrastate toll lines.

If the disparities are not caused by faulty allocations of plant and expenses, but are due to superior operation of the interstate toll lines, then the allocations should not be disturbed. We have mentioned that there is no finding that rate base aggregating $6,194,114 in amount which the commissioner's order shifts from intrastate to interstate and $423,328 of expenses which he shifts in the same way are not employed and incurred in the operation of the intrastate plant.

We believe that the phases of the problem just mentioned which arise out of Mr. Bushnell's testi-

mony quoted in preceding paragraphs should receive more attention. ORS 756.550(3) says:

> "After the completion of the taking of evidence, and within a reasonable time, the commissioner shall prepare and enter findings of fact and conclusions of law upon the evidence received in the matter and shall make and enter his order thereon * * *."

*Valley and Siletz R. R. Co. v. Flagg,* 195 Or 683, 247 P2d 639, applied that rule.

This cause is remanded to the circuit court with instructions to remand it to the commissioner so that he may enter findings required by ORS 756.550(3) upon the evidence concerning the purported superiority of the interstate long distance operations. He should also enter findings upon the subject of the two M-M-M plans, that is, the company's and Mr. Bushnell's. This court expresses no opinion concerning the merits of either plan. The commissioner is, of course, at liberty to receive more testimony if he so wishes concerning those plans and the superiority, if any, of the interstate long distance operations as contrasted with the intrastate toll operations.

Remanded.

O'CONNELL, J., dissenting.

The majority opinion has subjected the Commissioner's findings and order to a de novo re-examination, apparently upon the assumption that since a claim of confiscation has been raised by plaintiff company this court has the authority under the so-called Ben Avon doctrine (*Ohio Valley Water Co. v. Ben Avon Borough,* 253 US 287, 40 S Ct 527, 74 L Ed 908 (1920)) to exercise its independent judgment in re-

viewing administrative action where confiscation is alleged.

Although it must be conceded that *Ohio Valley Water Co. v. Ben Avon Borough,* supra, has not been expressly overruled, it is patent in the more recent cases decided by the United States Supreme Court that the Ben Avon doctrine is no longer applied by the United States Supreme Court. *Alabama Comm'n. v. Southern Ry. Co.,* 341 US 341, 71 S Ct 762, 95 L Ed 1002 (1951); *Railroad Commission of Texas v. Rowan & Nichols Oil Co.,* 311 US 570, 61 S Ct 343, 85 L Ed 358 (1941); *Railroad Commission of Texas v. Rowan & Nichols Oil Co.,* 311 US 614, 61 S Ct 66, 85 L Ed 390 (1940); *Railroad Commission of Texas v. Rowan & Nichols Oil Co.,* 310 US 573, 60 S Ct 1021, 84 L Ed 1368 (1940). It is also demonstrable, I believe, that the doctrine is not defensible. Brown, The Functions of Courts and Commissions in Public Utility Rate Regulation, 38 Harv L Rev 141 (1924); Davis, Judicial Review of Administrative Action in West Virginia— A Study in Separation of Powers, 44 W Va L Q 270 (1938); Freund, The Right To a Judicial Review in Rate Controversies, 27 W Va L Q 207 (1921); Jaffe, Judicial Review: Constitutional and Jurisdictional Fact, 70 Harv L Rev 953 (1957); Landis, Administrative Policies and the Courts, 47 Yale L J 519 (1938). *But cf.,* Joslin and Miller, Public Utility Rate Regulation: A Re-examination, 43 Va L Rev 1027 (1957).

Whether the issue presented upon review is stated in terms of a "constitutional fact" or otherwise, the judicial power of review should be limited to a determination of whether there was substantial evidence to support the agency's finding. *St. Joseph Stock Yards Co. v. United States,* 298 US 38, 73, 56 S Ct 720, 80 L Ed 1033, 1052 (1935) (concurring opinion).

The scope of judicial review will certainly vary with the type of question presented and with the character of the administrative agency which has made the initial determination subjected to review. Davis, Judicial Review of Administrative Action in West Virginia— A Study in Separation of Powers, 44 W Va L Q 270, 369 (1938). But the variation cannot be expressed in the distinction between the reviewability of constitutional and non-constitutional facts. And in neither case should the court propose to substitute its "independent judgment" for that of an administrative agency invested by the legislature with the power to make the determination sought to be set aside.

The court's function in reviewing administrative action is not to inject its notions of what constitutes good policy or to make its independent judgment as to the reasonableness of the administrative determination. The administrative order cannot be disturbed unless it can be said that the agency's determination is not supported by substantial evidence. The court's principal function is essentially the same as that which it performs in reviewing the findings of a jury or of a lower court, namely, to assure those adversely affected by official discretion that such discretion is exercised upon arguably rational grounds. It requires a large measure of conceit for this court to propose to do more. The problems involved in rate making are intricate. The Public Utility Commissioner and his staff are far better prepared than we to solve such problems. Our power to set aside orders not based upon rational grounds is sufficient protection to those affected by the administrative action. Neither *Valley & Siletz R. R. Co. v. Flagg,* 195 Or 683, 247 P2d 639 (1952), nor *Pac. Tel. & Tel. Co. v. Wallace,* 158 Or 210, 75 P2d 942 (1938), carefully considered the ques-

tion of the desirable limits of judicial review and should not be regarded as binding upon us.

Even if the so-called Ben Avon doctrine is regarded as a part of our law of judicial review, the record in this case does not contain sufficient data for us to conclude (through the exercise of our independent judgment) that the plaintiff company is entitled to the increase in rates which they seek. The validity of its claim for the requested increase in rates rests upon the validity of the method used in allocating the value of property jointly employed in both interstate and intrastate service. The plaintiff company has the burden of proof to establish that it is entitled to the requested increase. ORS 757.210; *Birmingham Electric Co. v. Alabama Pub. Serv. Com'n.*, 254 Ala 140, 47 So2d 455 (1950); *City of Ft. Smith v. Southwestern Bell Telephone Company*, 220 Ark 70, 247 SW2d 474 (1952); *Antioch Milling Co. v. Pub. Service Co. of Northern Ill.*, 4 Ill2d 200, 123 NE2d 302 (1954); *City of Pittsburgh v. Pa. P. U. C.*, 182 Pa Super 551, 128 A2d 372 (1957); *Application of Chicago & N.W.R.R. Co.*, 79 Wyo 343, 334 P2d 519 (1959). It follows that plaintiff has the burden of establishing the validity of its separation formula; this it has not done.

Plaintiff has used the Separations Manual in arriving at its allocation of values and expenses. Because the manual is recognized and used by most of the rate regulatory bodies in the United States, including the Federal Communication Commission, there is the temptation to concede its validity, if only for the purpose of arriving at some uniform plan of allocation. But the long and widespread use of the Separations Manual does not endow it with validity and if it is defective the Public Utility Commissioner in this state

need not accept it as a basis for a requested increase in rates.

Moreover, assuming that the Separations Manual is a rational method of arriving at joint costs, the company has no right to demand its use if the commissioner's formula for separation is also rational. In such case, even if the Ben Avon doctrine, as modified by the St. Joseph's case (298 US 38), is followed, we would be required to sustain the commissioner's order since in the choice of two rational methods of separation there is, under the principle of the St. Joseph's case, "a strong presumption" in favor of the conclusions reached by the administrative agency.

Because the plaintiff company has the burden of establishing a reasonable basis for an increase in intrastate rates, it is pertinent to determine whether the method of allocation which it uses is sound. If it is not, the plaintiff is not entitled to an increase in rates irrespective of the alleged invalidity of the commissioner's proposed basis for increasing the valuation of the intrastate plant.

The Separations Manual allocates the value of the plant employed in interstate and intrastate service upon the basis of actual use. Time studies show average use of 27.22 minutes per day and 0.85 minutes per day respectively for intrastate and interstate use. The company's allocation was based upon this ratio of uses. Bearing in mind that the ultimate purpose in making the allocation of intrastate and interstate use is to arrive at a reasonable rate, it immediately becomes obvious that the method adopted by the plaintiff is circular. Use determines value; value determines the rate; the rate (for interstate calls) determines use.

The vice of the method endorsed by the Separations Manual and used by plaintiff company is not simply that it offends the technical rules of logic; more importantly, the method is subject to criticism because, although it purports to equate use with value, it does so by comparing two different kinds of use, i.e., local use, the frequency of which is unaffected by the flat monthly charge, and interstate use, which is restrained because a toll is imposed upon it. And, as already observed, the rate which affects the use and thus the value is the very thing which the process seeks to determine.

The inadequacy of the method employed by the plaintiff company in the present case has been noted by others. In *Public Util. Comm'n. v. New England Tel. & Tel. Co.,* 80 PUR (NS) 397, 410 (1949), the Maine Public Utilities Commission commented as follows:

"It is clear to us that one patent fallacy in the use of the subscriber line usage factor lies in the fact that the character and extent of the use is to a large degree determined by the nature of the charge. The Company admits that a greater number of long-distance calls, and of greater duration, would be made if such calls were paid for at a flat monthly rate, as is exchange service, instead of on the basis of each individual call and the time and distance involved. Mr. Tozier testified that, based upon experience in the New England Company, the elimination of a 5-cent toll, when adjoining stations are combined, results in a doubling of the number of calls, while the elimination of a 10-cent toll would triple the number of calls, and that resulting conversations increase in length as well as frequency. The elimination of the toll charge on interstate calls which average $1.029 per call would result in an increased use which would be much, though not proportionately, greater.

"*It is thus apparent that the rates affect the use, while the Company undertakes, by the subscriber line usage factor, to make the use a vital factor in determining the rates.* This being so, the method as currently applied appears to us to be unsound. It should at least be so modified as properly to compensate for the different conditions of use in intrastate and interstate service caused by the different method of charging for exchange and toll service." (Emphasis added).

Others interested in the subject of rate making have criticized the method of allocation contained in the Separations Manual on the same ground. *In re Wisconsin Tel. Co.*, 86 PUR (NS) 79, 83 (1950) the Separations Manual was criticized because "the very usage upon which the allocation was based was, in the case of toll service, deterred by the form of rate applicable to such service and in the case of exchange service unrestrained because of the form of rate." In *New England Tel. & Tel. Co. v. State*, 98 N H 211, 97 A2d 213 (1953), the conclusion of the commission's expert witness was summarized by the court as follows:

"* * * it was Gerrish's opinion that to make exchange and toll calls comparable units from which to determine the relative use of the subscribers' line plant, the free and unlimited exchange use must be equated to measured or toll use." *Id.* at 216, 97 A2d 213, 217.

The Maine Public Utilities Commission stated that it could "not see how so-called 'free' calls can be treated equally with 'pay' calls." *Re New England Tel. & Tel. Co.*, 94 PUR (NS) 65, 78 (1952). *Re New England Tel. & Tel. Co.*, 97 PUR (NS) 410, 417 (1952); *Re Wisconsin Tel. Co.*, 86 PUR (NS) 79, 83 (1950); *Public Util. Comm'n. v. New England Tel. & Tel. Co.*, 80 PUR (NS) 397, 410 (1949). *See also,* criticism noted in Rose, The Bell Telephone System Rate Cases, 37

Va L Rev 699, 730 (1951). *But cf.*, Note, 54 Colum L Rev 431 (1954); Note, 102 U Pa L Rev 689 (1954).①

The criticism leveled at the so-called actual use method of allocation on the ground of circularity is well taken. The separation method being unsound, the commissioner was not required to accept it as the basis for fixing a new schedule of rates for plaintiff company's intrastate operations. He had the choice of completely rejecting the tariffs submitted by the company until a rational method of allocation was submitted or of modifying the company's method in some way that would render it sound. The commissioner attempted to eliminate the circularity involved in the

---

① The Separations Manual has been criticized on other grounds. Re Michigan Bell Telephone Company, 32 PUR3rd 395 at 403, in commenting upon the actual use basis Commissioner Lee, in a dissenting opinion, said: "The plan is based on the unrealistic theory that the time the telephone is used on a local call is just as valuable as the time the telephone is used on a toll call. This clearly is not true as the company itself derives substantially more revenue from the toll call." A similar criticism is made in Re New England Tel. & Tel. Co., 82 PUR (NS) 590 (1949). Re Illinois Bell Tel. Co., 92 PUR (NS) 164, 204 (1951) criticizes the manual's procedure because it ignores economic reality: "The 'use' theory on which the Manual is based ignores the economic facts. In the first place, company witnesses agreed that the interstate business, which consists entirely of toll business, is more unstable than the intrastate business, which consists largely of local exchange business. The 'use formula' has the effect of shifting this instability so that the intrastate and interstate businesses bear it in proportion to their magnitude. Since the intrastate business is much the larger part, the result is that it bears most of the effects of the instability of the interstate business.

"Furthermore, the separations give the entirely false impression that there are two distinct businesses existing side by side without relationship to each other. In fact, the interstate business could hardly operate profitably by itself, although the intrastate business could stand alone. The combination of the two appears to be more profitable because the two services are provided through use of the same equipment and through reliance on operation by the same personnel in large part." See also Re Northwestern Bell Tel. Co., 81 PUR (NS) 375, 389 (1949); Public Util. Comm'n. v. New England Tel. & Tel. Co., 80 PUR (NS) 397, 411 (1949).

actual use method by removing the influence of the toll upon the use for interstate purposes. The separation formula could be adjusted to provide a valid comparison of the two types of use, intrastate and interstate, either by determining the effect upon use for local calls by the imposition of tolls or by determining the effect upon use for interstate calls if the tolls were removed. The adjustment either way would be necessary to obtain comparable uses, i.e., uses affected by similar conditions. The commissioner elected to adjust the formula by eliminating the tolls from interstate use. There was no data showing what effect the flat rate applicable to local use would have upon interstate use. But, there were available studies showing the change in use when tolls were lifted from intrastate service. Bushnell, the defendant's witness, testified that the company's experience in Oregon showed that the conversion of toll calls to flat rate exchange service increases the volume of calls three times on the shortest routes and up to six times on longer routes. Similar testimony is found in the reported decisions of other public utilities commissions. *New England Tel. & Tel. Co. v. State,* 98 N H 211, 216, 97 A2d 213, 217, 99 PUR (NS) 111, 116 (1953); *Re New England Tel. & Tel. Co.,* 94 PUR (NS) 65, 78 (1952); *Re Wisconsin Tel. & Tel. Co.,* 86 PUR (NS) 79, 83 (1950); *Public Util. Comm'n. v. New England Tel. & Tel. Co.,* 80 PUR (NS) 397, 410 (1949).

To arrive at the equivalent of a flat rate for interstate calls the defendant commissioner adopted a factor of three as the basis of adjustment; thus, the actual use for interstate purposes on a flat rate basis was calculated to be three times 0.85, the actual use restrained by the toll. This was a reasonable method of adjusting the obviously illogical and unsound

method adopted in the Separations Manual and used by the plaintiff company.

It will be noted that the employment of the factor of three to equate interstate and intrastate use does not involve a weighing of the relative value of the respective uses and ascribing to the interstate use a value three times that of intrastate use.[2] An increase in the time allocated to interstate use will, of course, increase the *valuation* attributable to interstate service. The factor of three is used not because interstate use is more valuable, but merely to obtain an estimate of the actual time the plaintiff's plant would be in use for interstate service if no tolls were charged. It is not improper to speak of the use of the factor of three as *equalizing* the value of interstate and intrastate service. This is brought out in *Re New England Tel. & Tel. Co.,* 97 PUR (NS) 410, 417 (1952): "The premise on which the modification of three is based is that free unlimited use must be equated to measured or toll use to produce similar and comparable quantities reflecting the value of service and the measure of this value is clearly shown by company experience." See also, *Re Northwestern Bell Tel. Co.,* 81 PUR (NS) 375, 389 (1949). Witness Bushnell and the commissioner compare the interstate and intrastate service in terms of their relative value to the subscriber. The majority of the court is justified in criticizing this method of comparison. However, the majority opinion makes it appear that Bushnell and the commissioner rested their conclusion solely upon the basis of value to subscriber when in fact Bushnell's testimony makes

---

[2] See Public Util. Comm'n. v. New England Tel. & Tel. Co., 80 PUR (NS) 397, 411 (1949), where it is pointed out that the employment of such a factor "makes no change based upon the value of service."

it clear that the factor of three was used for the same reason as that urged by expert witnesses and commissioners in other cases to which I have previously referred, namely to equate the two uses, interstate and local, upon the same common ground unaffected by the toll charge. This is made evident from the commissioner's finding referred to in the majority opinion. That finding states in part: "In support of his selection of three as his recommended weighting value, Bushnell refers to the Company's experience in Oregon showing that conversion of toll calls to flat rate exchange service increases the value of calls three times on the shortest route and up to five or six times on slightly longer routes * * *." This reference to the increase in the volume of calls when the toll is lifted has nothing to do with the subjective value of a telephone call to the subscriber; it is relevant only to an argument that if frequency of use is the basis for separation the uses compared should be of the same kind, and the factor of three is used to equate these two types of use.

The commissioner also made an adjustment of the allocation method adopted by plaintiff company in its separation of the value of the interchange toll lines. The company's toll lines consist of two classes; (1) transiting toll circuits which have no terminal in the state and which are used normally only for interstate toll service, and (2) terminating toll circuits which have both ends in the state and which are used jointly for interstate and intrastate toll calls.

Under the Separations Manual adopted by plaintiff an initial allocation is made between transiting and terminating circuits, the unit of which is expressed in terms of average book cost per circuit mile for each circuit. Practically all the investment computed for

transiting circuits is assigned directly to interstate service. The total investment computed for terminating circuits is allocated between intrastate and interstate service.

The commissioner criticizes the company's system of separation of costs for the interexchange service on various grounds.[9] The commissioner's criticism of the separation made by plaintiff rests principally upon the premise that the plaintiff's operations in Oregon are a part of a unified operation extending throughout the entire Bell System. For that reason the commissioner was of the opinion that the transiting circuits and terminating circuits should be considered together in arriving at the valuation of the plant within the state of Oregon. Treated together the lower unit cost per message minute mile from the operation of the transiting lines with a high density of

---

[9] These grounds are summarized in the commissioner's order as follows: "First in the Company's failure to recognize that the investment and expenses of toll circuits are all really joint costs of one unified toll operation and should be treated as such, since the interstate circuits are not separately identifiable in the Company's primary accounting records but are intermingled in these records with the data on investment and expenses of the other toll circuits and even with other classes of plant. This defect is particularly well illustrated in the treatment of the investment in spare circuit facilities, which is spread over both transiting and terminating circuits without the benefit of any knowledge of the purpose for which it will be actually used. Second is the difference in treatment which the Company accords interstate transiting circuits and those terminating circuits which are used for interstate service. Third is the failure of the Company to give appropriate recognition to the fact that the toll network which is spread throughout the state serves as a branch line or feeder system for the long distance circuits. Related to this is the resulting failure of the Company to follow the practice not uncommon in other utility regulation, of charging the backbone line service with some of the costs of the feeder operations which give maximum usefulness to the main line and hence enhance its value to the point of warranting the heavy investment required in the main line."

traffic is averaged with the higher unit cost per message minute mile of the terminating circuits with a low density of traffic.

Further, because of the unified nature of the plaintiff's operations throughout the United States the commissioner deemed it reasonable to adjust the method adopted by the company in separating the value of terminating toll circuits in Oregon. The company's allocation between interstate and intrastate costs was based upon the relative message-mile-minutes of use within the state. The commissioner adopted the plan recommended by witness Bushnell under which the operation of the Bell System throughout the United States is used to determine the average cost of a message per minute miles based upon its total investment in the entire toll circuit plant of the Bell System. This nationwide average is then applied to the intrastate message-mile-minutes of the plaintiff company's operation in Oregon to arrive at the valuation of the intrastate toll plant.

The commissioner found that there was sufficient data from which to compute the allocation upon the foregoing basis. Plaintiff contends that the separation method adopted by the commissioner is unlawful, principally because it is based upon the average investment of Bell System companies throughout the country rather than upon the actual investment of the plaintiff in Oregon and, therefore, results in a dilution of plaintiff's actual intrastate investment. If the plaintiff's operation in Oregon is a part of a unified system throughout the United States, it is reasonable to consider the value of that system as a whole and the proportionate part of that value which is represented in the Oregon operation.

The commissioner's order was based upon rational grounds and should be sustained.

SLOAN, J., concurs in this dissent.

## ON REHEARING

Robert Y. Thornton, Attorney General for Oregon,

and Lloyd G. Hammel, Assistant Attorney General, for the petition.

PER CURIAM.

A petition for rehearing demonstrates that our opinion in this case has been misread by appellant. To avoid any misunderstanding we wish to make it clear that:

The opinion of the court did not purport to tell the Commissioner that he must adopt the Separations Manual. The opinion specifically held to the contrary. 73 Adv Sh 433, 365 P2d 1021.

The court did hold that there was no substantial evidence in the record to support the Commissioner's adoption of a factor of three as a part of his allocation of company properties. The court did not, and could not, otherwise attempt to tell the Commissioner what other evidence he should hear or what allocation formulae he should accept or reject.

It is not the duty of the court to fix or establish rates. Our duty is purely to review determinations made by the Commissioner. What additional proceeding should be had and what additional findings or order shall be made is for the Commissioner to decide. *Valley & Siletz R. R. Co. v. Flagg,* 1952, 195 Or 683, 715, 247 P2d 639.

Petition denied.